690 So.2d 154 (1997)
CITGO PETROLEUM CORPORATION, PlaintiffAppellee,
v.
YEARGIN, INC. (formerly known as Project Construction Corporation) and Continental Casualty Company, DefendantsAppellants.
No. 95-1574.
Court of Appeal of Louisiana, Third Circuit.
February 19, 1997.
Order Clarifying Decision on Limited Grant of Rehearing April 9, 1997.
*158 William M. Nolen, William Brock Swift, Robert Joseph Tete, Lake Charles, for Cito Petroleum Corporation.
Edmund M. Kneisel, Atlanta, GA, Keith Michael Borne, Lafayette, John A. Stewart, Jr., New Orleans, for Yeargin, Inc, etc.
Christopher M. Trahan, Lake Charles, for St. Paul Fire and Marine Insurance Company.
Before WOODARD, PETERS and SULLIVAN, JJ.
SULLIVAN, Judge.
Defendants-appellants, Yeargin, Incorporated and Continental Casualty Insurance Company (CNA), Yeargin's insurer, suspensively appeal a $4,280,987.73 judgment rendered in favor of Citgo Petroleum Corporation (Citgo). After trial on the merits, the trial court determined that a CNA policy issued to Project Construction Company (PCC), now known as Yeargin, provided coverage to Citgo, as an "additional insured," for damages which Citgo and its insurers paid in settlement of thirty-one personal injury claims and one wrongful death claim.

FACTS
The personal injury claims arose from a May 20, 1987 fire at Citgo's Lake Charles, Louisiana refinery near its Coker I unit. At the time of the fire, PCC was conducting turnaround or maintenance work in the Coker I unit pursuant to a January 1987 contract entered into between Citgo and PCC. The turnaround contract required PCC to name Citgo as an "additional insured" on a policy of comprehensive general liability insurance. PCC did so on the policy it obtained from CNA and issued a certificate of insurance to Citgo evidencing this coverage. The CNA policy provided PCC with five million dollars of comprehensive general liability coverage. PCC's retained liability or deductible under the policy was likewise five million dollars.
The fire was caused by gasoline and hydrocarbons which leaked from a missing valve in a "slop line." Citgo operations personnel sent excess gasoline, which had built up in a debutanizer tower, to the slop collection line. Because the turnaround operations were taking place, part of the slop collection system was blinded off, which caused the gasoline to back-up in the system and eventually leak through the missing valve and onto the ground in the vicinity of the PCC turnaround work. The gasoline ignited.
Most of the injured individuals and the one dead man were PCC employees. Two of the injured workers were employed by the Lake Charles Electric Company. Many of the injured workers and the dead worker's family filed claims against Citgo and its three insurers, the Insurance Company of North America (INA), U.S. Fire Insurance Company (U.S.Fire), and CIGNA.
Citgo and its insurers developed a strategy aimed at settling all of the claims before any went to trial. In settlement of the thirty-two claims, Citgo and its insurers paid a total of $6,925,665.31. Citgo paid the first three million dollars, the amount of its retained liability under its primary three million dollar policy with INA. The next two million dollars in settlement was paid by U.S. Fire pursuant to its excess policy issued to Citgo. The final $1,925,665.31 was paid by CIGNA under its five million dollar excess umbrella policy issued to Citgo.

PROCEDURAL HISTORY
On August 25, 1988, Citgo filed the present action against Yeargin and CNA seeking indemnity from Yeargin under the provisions of the turnaround contract and coverage as an "additional insured" under the CNA policy. In its petition, Citgo asserted that the contract between PCC and Citgo obligated PCC to indemnify Citgo and provide it with a defense of the personal injury claims. Citgo also asserted that the CNA policy covered Citgo and that CNA also agreed to defend and hold harmless Citgo from the claims of the personal injury plaintiffs. Additionally, Citgo maintained that CNA acted arbitrarily and capriciously in denying coverage to Citgo and refusing to defend Citgo.
On August 9, 1991, Citgo filed a motion for partial summary judgment in which it asserted the CNA policy covered Citgo for its own negligence and CNA was therefore obligated *159 to defend Citgo. It also sought judgment decreeing that the CNA coverage was primary for the first three million dollars and provided coverage thereafter on a fifty/fifty percent basis with the U.S. Fire excess coverage. Yeargin and CNA responded with a motion for summary judgment seeking to have the CNA coverage of Citgo decreed as excess to the ten million dollars in coverage available to Citgo through INA, U.S. Fire and CIGNA.
On September 1, 1992, the trial court granted Citgo's motion as prayed for and denied the motion filed by Yeargin and CNA. Yeargin and CNA appealed to this court from the granting of summary judgment and sought a supervisory writ of review from the denial of their own motion for summary judgment.
On August 27, 1993, this court reversed the partial summary judgment rendered in favor of Citgo, finding that "genuine issues remain to be resolved as to material facts in this case." For the same reason, this court determined that the trial court correctly denied the motion for summary judgment filed by Yeargin and CNA. Citgo then sought review of this court's ruling with the Supreme Court of Louisiana.
On October 1, 1993, Yeargin and CNA filed a third party demand against St. Paul Fire and Marine Insurance Company (St.Paul), which provided primary and excess insurance coverage to the Lake Charles Electric Company. Yeargin and CNA asserted that, because Citgo was named as an "additional insured" on the St. Paul insurance policies, Yeargin and CNA were entitled to indemnity and/or contribution from St. Paul in the event they were found liable to Citgo.
On December 20, 1993, the supreme court denied Citgo's application for review of this court's reversal of the partial summary judgment. The supreme court remanded the case to the trial court.
The trial of this matter took place from January 23 to January 28, 1995. On the first day of trial, prior to jury selection, the trial judge ruled that he would decide the issue of whether the CNA insurance policy issued to PCC provided coverage to Citgo as an "additional insured." He also ordered that the jury would not be presented with evidence or testimony concerning (1) the intent of PCC and Citgo in formulating the insurance requirements, and (2) the regular practice of the business community in formulating such contractual provisions. Additionally, the trial judge decreed that the jury would decide (1) whether the settlements entered into between Citgo, its insurers and the personal injury claimants were reasonable, and (2) whether CNA acted arbitrarily and capriciously in refusing to pay Citgo's claims within sixty days of satisfactory proof of loss.
Before trial, Citgo and Yeargin settled Citgo's contractual indemnity claim against Yeargin. Therefore, at trial, the most contested issue was whether the CNA policy issued to PCC provided coverage to Citgo as an "additional insured" for its own negligence in causing the fire. The trial judge heard evidence on this issue outside the presence of the jury.
At the close of evidence, St. Paul orally moved for directed verdict, asserting that its policy only covered Citgo as an additional insured "for bodily injury arising out of Citgo's general supervision of Lake Charles Electric Company's work." St. Paul argued that no evidence was presented by third party plaintiffs, Yeargin and CNA, to show Citgo's general supervision of the Lake Charles Electric Company's employees in any way contributed to the cause of the accident. The trial court determined that the St. Paul policy did not provide coverage to Citgo under the circumstances and, therefore, granted St. Paul's motion for directed verdict. St. Paul was dismissed from the suit.
The trial judge then ruled that the CNA policy provided Citgo with insurance for its own negligence. He reasoned that, because PCC used clear language in the indemnity provision of the turnaround contract which obviously did not extend PCC's obligation to indemnify Citgo for "the sole negligence of Citgo" and did not use as clear language in the insurance clause of the contract or the certificate of insurance, PCC knew that Citgo wanted to be covered for Citgo's own negligence. In construing the "other insurance" clause of the CNA policy, he concluded that *160 the CNA policy provided Citgo with primary insurance for the first three million dollars of loss because the CNA policy's "other insurance" provision, that it does not apply if "any other valid and collectible insurance is available to the Insured," did not contemplate Citgo's three million dollar retained liability under the INA policy. He concluded that the fact that Citgo's retained liability equaled the INA policy's liability limit made the coverage self insurance. In other words, the trial judge determined that the word "insurance" in the CNA policy's "other insurance" clause did not include self insurance within its scope. The trial judge then found that, above the three million dollar point, the CNA policy issued to PCC and the U.S. Fire policy issued to Citgo would share coverage of the loss on a fifty/fifty percent basis. The trial judge also concluded that CNA had a duty to defend Citgo against the personal injury and wrongful death claims.
Thereafter, the jury then rendered its verdict in which it concluded that Citgo and its insurers acted reasonably in entering into all of the settlements. The jury also determined that the failure of CNA and/or Yeargin (PCC) to pay the claims of Citgo within sixty days of receipt of satisfactory proof of loss was arbitrary, capricious, and without probable cause.
The trial court signed a judgment against CNA and in favor of Citgo on February 16, 1995 in the net amount of $4,280,987.73 plus legal interest from January 28, 1995, the date upon which the judgment was rendered. This figure was derived as follows:

 Principal Plus
 Principal Accrued Interest
1) CNA obligation for settlements $4,964,332.66 $8,074,430.66
2) Costs of defense 243,698.05 388,476.05
3) La.R.S. 22:658: 10% penalty plus attorney fees 818,081.02
 _____________
 Subtotal $9,280,987.73
4) Contractual Credit for Settlement of Citgo's
 Indemnity Claim against Yeargin 5,000,000.00
 _____________
 TOTAL JUDGMENT $4,280,987.73
 =============

Yeargin and CNA suspensively appealed this judgment on March 13, 1995. They maintained on appeal that the trial court erred in the following particulars:
1) Failing to allow the jury to resolve the issues of insurance coverage;
2) Concluding that PCC agreed to obtain insurance covering Citgo for its own negligence and that the CNA policy provided such coverage;
3) Finding that the CNA policy covered Citgo for punitive damages;
4) Finding that the CNA policy provided Citgo with exclusive primary coverage for the first three million dollars;
5) Finding that the CNA policy provided excess coverage from three million dollars to its five million dollar policy limit on a fifty/fifty percent basis with Citgo's excess insurer, U.S. Fire;
6) Ruling that CNA had a primary duty to defend Citgo against the asserted claims and that CNA was liable for Citgo's defense costs;
7) Limiting the jury interrogatory to the reasonableness of the settlements entered into by Citgo, its insurers, and the claimants and rejecting CNA's requested special jury interrogatories;
8) Excluding from evidence the reasons for CNA's refusal to defend Citgo while allowing the jury to decide the reasonableness of CNA's refusal to defend Citgo;
9) Rendering a directed verdict in favor of third-party defendant, St. Paul Fire and Marine Insurance Company; and,
10) Denying Yeargin and CNA the opportunity to proffer Dr. Robert Felton's deposition testimony and denying Yeargin and CNA the use of Dr. Roy *161 Wright, Jr.'s deposition testimony for purposes of impeaching his trial testimony.
On July 3, 1996, this court rendered an opinion in which we determined that appellants' first assignment of error was meritorious. Citgo Petroleum Corp. v. Yeargin, Inc., 95-1574 (La.App. 3 Cir. 7/3/96); 678 So.2d 936. This court concluded that Yeargin and CNA, which had requested a jury trial on all issues, were wrongfully denied their right to have the issue of insurance coverage decided by the jury. Because this fundamental right had been usurped without the consent of Yeargin and CNA, a requirement of La.Code Civ.P. art. 1562(D), we reversed the trial court judgment and remanded the case for a new trial. In that opinion, we pretermitted analysis and resolution of the remaining nine assignments of error because we found the first assignment to be dispositive.
Citgo and St. Paul timely filed applications for writs of certiorari with the Supreme Court of Louisiana. They primarily asserted that this court erred in finding merit in the jury trial assignment of error. Citgo and St. Paul also maintained that, whether or not our holding was correct, we erred in remanding the case to the trial court and not deciding the case on its merits since the trial had taken place and the entire record was before us on appeal.
On November 15, 1996, the supreme court granted the writ applications filed by Citgo and St. Paul. In its one sentence order, the supreme court stated "Granted and remanded to the court of appeal to decide the case on the record. Gonzales v. Xerox, 320 So.2d 163 (La.1975)." Citgo Petroleum Corp. v. Yeargin, Inc., 96-2000, (La. 11/15/96); 682 So.2d 746; Citgo Petroleum Corp. v. Yeargin, Inc., 96-2007 (La.11/15/96); 682 So.2d 747.
The rule of Gonzales, 320 So.2d 163, and its progeny provides that when an appellate court finds that a reversible legal error or a clear error of material fact was made in the trial court, it is required, whenever possible, to review the case de novo from the entire record and render a judgment on the merits. See Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95); 650 So.2d 742; Rosell v. ESCO, 549 So.2d 840 (La.1989); McLean v. Hunter, 495 So.2d 1298 (La.1986); Otto v. State Farm Mut. Auto. Ins. Co., 455 So.2d 1175 (La.1984); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980). This principle is based on the Louisiana Constitution's grant of appellate court jurisdiction in civil cases to the review of facts as well as law and the strong public policy of fostering judicial economy.
In compliance with the supreme court's order, we shall examine the merits of appellants' nine remaining assignments of error.

ASSIGNMENT OF ERROR NUMBER TWO
In this assignment of error, Yeargin and CNA maintain that the trial court erred in determining that PCC agreed to obtain insurance coverage for Citgo's independent negligence and that the CNA policy provided such coverage. They contend that the language of the certificate of insurance issued by PCC to Citgo clearly limited coverage to PCC's operations and did not contemplate coverage for Citgo's negligence.
The original turnaround contract, executed by and between PCC and Citgo on December 30, 1985, obligated PCC to obtain insurance naming Citgo as an insured as follows:
18. Insurance. CONTRACTOR shall procure and maintain with reputable insurance companies, acceptable to CITGO, the insurance set forth below during the performance of this Contract. CONTRACTOR shall furnish certificates evidencing such insurance is in force and providing thirty (30) days advance written notice in the event of material change or cancellation. The required insurance is as follows:
. . . .
c. Comprehensive General Liability Insurance covering all services to be performed hereunder, including coverages for liability assumed in this Contract, and removing Exclusions X, C, and U relating to underground property damage, excavations and explosions, not less than $2,000,000 per occurrence. The policy shall name CITGO as an additional insured.
*162 By a change order made effective January 1, 1987, PCC and Citgo lowered the coverage requirement to one million dollars per occurrence. Otherwise, the contract remained the same insofar as PCC's obligations to obtain insurance and name Citgo as an insured under the policy were concerned.
The CNA policy issued to PCC contained the following pertinent provisions:
SECTION I. INSURED, TERM, TERRITORY
. . . .
2. InsuredThe term "insured" shall include the named insured and:
. . . .
(g) any other party whom the named insured may elect to designate as an insured on a certificate of insurance certifying coverage under this policy.
. . . .
SECTION II. PERSONAL INJURY AND PROPERTY DAMAGE LIABILITY
1. The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgment or settlements.
. . . .
4. This insurance does not apply:
. . . .
(d) to any obligation for which the insured or any carrier as his insurer may be held liable under any Workers Compensation, unemployment compensation or disability benefit law, or under any similar law;
(e) to bodily injury to any employee of the insured arising out of and in the course and scope of his employment by the insured; but this exclusion does not apply to liability assumed by the insured under any contract;
The certificate of insurance issued by PCC to Citgo, in accordance with section I, subparagraph (2)(g) of the CNA policy, named Citgo as an additional insured under the CNA policy for the turnaround project. The certificate also identified PCC as the named insured. The following paragraph was added to the face of the certificate form in typewritten language:
It is agreed that the person or organization named as certificate holder is included as additional insured, but only with respect to liability arising out of operations performed for such additional insured by the named insured. It is further agreed that the insurance provided contains the standard waiver of subrogation provision in favor of the certificate holder. (Emphasis added)
In the "coverages" section, the certificate listed the specific CNA policy and provided the following:
THIS IS TO CERTIFY THAT POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE NAMED INSURED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL TERMS, EXCLUSIONS, AND CONDITIONS OF SUCH POLICIES.
The certificate also contained the following disclaimer language:
THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE *163 AFFORDED BY THE POLICIES BELOW.
The "certificate holder" is identified on the form as Citgo.
Yeargin and CNA argue that the typewritten addition to the certificate, especially the emphasized portion quoted above, limits the scope of coverage afforded Citgo as an "additional insured" to liability resulting from PCC's operations or fault and does not include liability arising from the sole independent negligence of Citgo. Alternatively, they maintain that, even if Citgo fits the specific definition of an "insured" under the policy, exclusion 4(d), dealing with work-related injuries covered by workers' compensation insurance, and exclusion 4(e), dealing with work-related injuries not covered by workers' compensation insurance, operate to exclude coverage of Citgo.
We must determine whether the CNA policy provided coverage to Citgo under the circumstances of this case. Yeargin and CNA assert that PCC and Citgo, as parties to a commercial transaction, could agree to vary the coverage terms of the underlying CNA insurance policy. They maintain that this is what PCC did by operation of the certificate which expressly limited coverage of Citgo to liability arising from PCC's operations. They argue that La.R.S. 22:628, the "entire contract policy statute," was not intended to allow an additional insured to circumvent its contractual agreements which vary the terms of the policy. This statute provides:
No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance. This Section shall not apply to contracts as provided in Part XV of this Chapter.
The provisions of this Section shall apply where a policy or other written evidence of insurance is coupled by specific reference with another policy or written evidence of insurance in existence as of the effective date hereof or issued thereafter.
Any written agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be deemed to be physically made a part of a policy or other written evidence of insurance, within the meaning of this section, whenever such written agreement makes reference to such policy or evidence of insurance and is sent to the holder of such policy or evidence of insurance by United States mail, postage prepaid, at such holder's last known address as shown on such policy or evidence of insurance or is personally delivered to such holder.
This statute is inapplicable to the present situation. Its intent is to protect the policyholder, i.e., the party that paid the premium, from the insurer's fraud or deception in changing the policy terms without notifying the policyholder. Lindsey v. Colonial Lloyd's Ins. Co., 595 So.2d 606 (La. 1992). It requires that, if a change in coverage is made by the insurer, it must attach to or incorporate the change in the policy and notify the insured with reference to the policy. In that respect, appellants are correct that the statute does not purport to regulate the agreements made between the named insured or policyholder and an additional insured.
Whether extra-policy agreements between a policyholder and an additional insured which purport to extend, modify or limit coverage are binding on the insurer is a different matter altogether. In that regard, La.R.S. 22:654 provides the scope of our inquiry as follows:
Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy.
Additionally, the often-cited rules of contractual interpretation found in Civil Code articles 2045-57 apply to the construction and interpretation of insurance policies.
*164 La.R.S. 22:654, by its clear wording, limits our inquiry in this case solely to the meaning of the terms and conditions of the CNA policy and "any rider, endorsement or application." A certificate of insurance is not a "rider, endorsement, or application." We cannot examine the certificate for purposes of determining if it modifies the terms of coverage because, by operation of this statute, the certificate cannot amplify, extend or modify coverage. This is not a situation in which the policy language and the language found in an accompanying rider or endorsement are in conflict. It is well settled that, in that situation, the language of the rider or endorsement prevails. See Corkern v. Main Ins. Co., 268 So.2d 138 (La. App. 1 Cir.), writ not considered, 263 La. 608, 268 So.2d 673 (1972). In this situation, La.R.S. 22:654 precludes a review of the certificate of insurance to determine if, as argued by Yeargin and CNA, it modified or limited the policy coverage afforded to Citgo as the "additional insured." A certificate of insurance simply cannot be utilized to do so.
Even if the applicable law allowed us to determine whether the certificate actually limited the coverage afforded Citgo as an "additional insured," the certificate itself contains clear and unambiguous language evidencing that it does not "amend, extend or alter" the coverage afforded under the CNA policy. The certificate also states that it is issued for informational purposes only. This language on the certificate would render impotent the conflicting limitational language which was added to the certificate. For these reasons, we are constrained to consider the narrow issue of whether Citgo is an insured with reference only to the terms and conditions of the CNA policy.
An insurance contract is to be construed as a whole, and one part of the policy is not to be construed separately at the expense of disregarding other sections or provisions. La.Civ.Code art. 2050; Central Louisiana Elec. Co., Inc. v. Westinghouse Elec. Corp., 579 So.2d 981 (La.1991). If the words of a contract, given their generally prevailing meaning, are clear, explicit and lead to no absurd consequences, the contract is to be construed as written and no further interpretation may be made in search of the parties' intent. La.Civ.Code arts. 2046, 2047. When, however, the contractual provisions are susceptible to multiple interpretations or ambiguity, then extrinsic evidence is admissible to determine the meaning that best conforms to the purpose of the contract. McDuffie v. Riverwood Intern. Corp., 27,292 (La.App. 2 Cir. 8/23/95); 660 So.2d 158.
We conclude that Citgo is an "insured" under the terms and conditions of the CNA policy issued to PCC. The policy language defining the term "insured" is clear and unambiguous. It plainly defines "insured" as including a party whom the named insured, PCC, elects to designate as an insured on a certificate of insurance. The policy gives PCC the discretion to name a third party as an additional insured under the terms and conditions of the policy, but it does not give PCC the right to, by separate agreement with the third party, limit the terms and conditions of the coverage under the policy as they apply to the third party. Undisputedly, PCC designated Citgo as an "additional insured" on a certificate of insurance which it issued to Citgo. Therefore, Citgo was an "insured" under the provisions of the CNA policy and was entitled to coverage from CNA.
Yeargin and CNA next argue that, at a trial on the merits of the personal injury plaintiffs' claims, Citgo would more than likely have been found to be the statutory employer of PCC's employees injured in the fire. They contend that, in settling these claims, Citgo waived a viable statutory employer defense which it could have asserted and been successful with had the claims proceeded to trial. They maintain that exclusions 4(d) and 4(e) are therefore applicable to bar coverage to Citgo for these work-related injuries.
In Capital Bank & Trust Co. v. Equitable Life Assur. Soc. of U.S., 542 So.2d 494, 496 (La.1989), the supreme court stated:
Insurance policies are liberally construed in favor of coverage, and exceptions to coverage are strictly construed against the insurer. LSA-C.C. art. 2056. Any ambiguity is construed in favor of coverage. *165 Albritton v. Fireman's Fund Insurance Co., 224 La. 522, 70 So.2d 111 (1953). The insurer has the burden of proving that a policy exclusion precludes recovery. Lado v. First Nat. Life Ins. Co., 182 La. 726, 162 So. 579 (1935). (Footnote omitted.)
At trial, Gregory Massey, an attorney who formerly worked for the Jones, Tête law firm which represented Citgo, testified that he was the primary legal investigator assigned to the accident. He stated that he recommended the quick settlement offers because he was concerned with Citgo's potential exposure to punitive damages under now-repealed Civil Code article 2315.3 Massey said that he was likewise concerned with the viability of the statutory employer defense because he considered it to be an "all or nothing" defense due to Citgo's obvious negligence. He said, however, that in each answer filed in response to suits arising from this accident, Citgo pled the statutory employer defense.
Citgo also presented the testimony of Raleigh Newman and Jennings B. Jones, Jr., two personal injury attorneys who represented certain claimants. They each stated that, in their opinions, Citgo's statutory employer defense would not have succeeded had the claims not been settled.
Glen Roach, Citgo's risk manager at the time of the accident, testified that in determining whether to settle the claims, he and the attorneys weighed the potential for punitive liability against the potential viability of the statutory employer defense. He said that the defense was considered strong but not impenetrable.
Peter Feringa, an insurance defense attorney who specializes in industrial accident cases, testified on behalf of Yeargin and PCC. He stated that, in consideration of the factors of Berry v. Holston Well Serv., Inc., 488 So.2d 934 (La.1986)[1], he felt that Citgo would qualify as the statutory employer of the claimants injured in the accident. Specifically, Feringa stated that PCC's work under the contract was nonspecialized and could be considered part of Citgo's trade, business or occupation; he opined further that Citgo was engaged in the work at the time of the accident. Feringa believed that the settlement amounts were fifty to sixty percent overvalued because Citgo failed to take into consideration the strong viability of the statutory employer defense in entering into the settlements.
The trial court was faced with a divergence of views on the viability and probable success of Citgo's statutory employer defense. Appellants' reliance on these two work-related injury exclusions involves speculation concerning what Citgo might have been able to prove had the personal injury claims proceeded to trial. The determination of whether a principal has successfully proven by a preponderance of the evidence that it is a statutory employer is necessarily a fact-intensive inquiry. A trier of fact's conclusion on the statutory employer defense issue would depend entirely on the quality, reliability and credibility of the evidence presented at such a trial. We decline to venture a guess as to what Citgo would have been able to prove at trials on the merits of the claims and whether a fact finder would have found this defense persuasive. The trial court did not err in rejecting appellants' arguments on the applicability of exclusions 4(d) and 4(e). Appellants' reliance on these two exclusions in an effort to preclude coverage is misplaced.
For these reasons, appellants' second assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
Yeargin and CNA maintain that the trial court erred in concluding that the CNA policy covered Citgo for its exposure to punitive damages.
The CNA policy at issue does not specifically contain an exclusion for coverage of punitive damages. The insuring agreement *166 provides that CNA will pay "on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or property damage to which this insurance applies, caused by an occurrence, ..." In Sharp v. Daigre, 555 So.2d 1361 (La.1990), the supreme court held that a specific exclusion from coverage for punitive damages does not offend public policy; however, where such an exclusion is not a part of the policy, punitive damages are considered to be covered. The CNA policy's coverage language quoted above is broad and provides coverage for "damages," which includes punitive damages. Therefore, the trial court did not err in concluding that the CNA policy covered Citgo for punitive damages.

ASSIGNMENT OF ERROR NUMBER FOUR
Yeargin and CNA next maintain that the trial court erred in finding that CNA's coverage to Citgo was primary coverage for the first three million dollars in loss. They argue that the CNA policy should be considered excess to the ten million dollars in coverage available to Citgo through its three insurers.
In making this determination, the trial court construed the "other insurance" clause of the CNA policy. The CNA "other insurance" clause provided:
This insurance does not apply to the extent any other valid and collectible insurance is available to the Insured, whether on a contributory, excess or escape basis or otherwise, but this condition does not apply to insurance specifically purchased by the named insured to apply in excess hereof.
The INA policy, which constituted the primary coverage obtained by Citgo, contained an "other insurance" clause which provided:

Other Insurance
The insurance provided by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.
When both this insurance and the other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:
(a) Contribution by Equal Shares. If all such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.
(b) Contribution by Limits. If any such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.
In construing the CNA policy's "other insurance" clause, the trial court reasoned that, since Citgo's three million dollar retained liability under the INA policy was the same as the liability limit of the INA policy itself, the INA coverage amounted to Citgo's self insurance. The trial court determined that the CNA policy's "other insurance" clause:
does not cover Citgo's situation, where they had self-insurance; that is, it was responsible for the first three million dollars. So, it was the intent of Citgo to be covered without having to go to its three million dollars of self insurance. In other words, I don't read the word "insurance" in the provisions just read by me in the CNA policy to mean self-insured insurance. *167 I think a self-insured program and an insurance policy is [sic] two different creatures.
Yeargin and CNA maintain that the trial court erred in holding that the INA coverage was self insurance. They contend that the CNA coverage should not apply because the INA insurance was in fact insurance which was "valid and collectible" by and "available" to Citgo, despite the fact that Citgo's retained liability equaled the liability limit under the INA policy.
McKenzie & Johnson, Insurance Law And Practice, 15 Louisiana Civil Law Treatise § 228, at 499 (2d ed.1996), classifies and explains the types of "other insurance" clauses as follows:
There are three basic types of other insurance clauses: (1) pro rata, (2) excess and (3) escape. A pro rata clause provides for a sharing of responsibility among the insurers. Such clauses may provide for contribution in proportion to the limits of liability of each policy, or they may provide for contribution in equal shares up to the limits of each policy.
Excess clauses provide that the coverage of the policy will be excess over other valid and collectible insurance so that the insurer will have no obligation to pay until the coverage of the other policy or policies has been exhausted. The first layer of coverage is usually called the primary policy over which there may be successive layers of excess coverage.
An escape clause purports to make the coverage of the policy applicable only in the event that there is no other insurance coverage available to the insured. Thus, the coverage of the policy is made contingent upon the absence of any other coverage.
When an insured is covered by more than one liability policy, each policy will contain an other insurance clause which may or may not be harmonious with the other insurance clauses contained in the other policy or policies. The courts are often called upon to reconcile the other insurance clauses in multiple policies in order to apportion the responsibility for the insured's liability among the insurers.
The "other insurance" clause in the CNA policy is an escape clause because coverage is not applicable if other insurance is "available" to the insured. The clause also contains the added requirement that, in order for the CNA coverage not to apply, the other available insurance also need be "valid and collectible" to the insured, a characteristic that Professors McKenzie and Johnson point out is primarily found in excess "other insurance" clauses. This factor does not, however, convert the clause from an escape clause to an excess clause. It still has the effective characteristics of an escape clause.
The "other insurance" clause of the INA policy is properly classified as a pro rata clause because it provides for sharing of responsibility by equal shares or according to policy limits when both insurance coverages apply on the same basis.
Our task is to attempt to reconcile the two disparate "other insurance" clauses. The proper approach is to try to give effect to both "other insurance" clauses and to find them mutually repugnant only if, by giving each effect, the insured is left with no coverage. Efferson v. Kaiser Aluminum & Chemical Corp., 816 F.Supp. 1103 (E.D.La. 1993).
Our review of this state's jurisprudence reveals that neither the supreme court nor the courts of appeal have dealt with conflicting escape and pro rata "other insurance" clauses. Three federal district court cases have held that, in the situation of conflicting escape and pro rata "other insurance" clauses, the clauses are not mutually repugnant. The federal cases give effect to the escape clause, resulting in that insurer escaping coverage when the policy with the pro rata clause is "available" to the insured. The pro rata clause is also given effect, resulting in that insurer shouldering all of the liability because, by operation of the escape clause, there is no other insurance with which to pro rate coverage.
In Viger v. Geophysical Services, Inc., 338 F.Supp. 808 (W.D.La.1972), aff'd and adopting district court opinion, 476 F.2d 1288 (5th Cir.1973), plaintiff, a Jones Act seaman, sued *168 GSI, his employer and vessel lessee, and Munchowich, the owner of the vessel upon which he was injured. The court found GSI completely at fault for Viger's injuries. GSI was covered by a Continental Insurance Company policy and was also named as an additional insured on Munchowich's policy written by Hanover Insurance Company. The Continental policy contained a pro rata "other insurance" clause similar to the one found in the INA policy in this case, and the Hanover policy contained an escape "other insurance" clause which provided:
Where the assured is, irrespective of this policy, covered or protected against any loss or claim which would otherwise have been paid by this Company, under this policy, there shall be no contribution or participation by this Company on the basis of excess, contributory, or double insurance or otherwise. Id. at 811.
The federal district court concluded that, because of the escape language of the Hanover policy, GSI had other insurance with Continental against the loss which would otherwise have been paid by Hanover. Therefore, the Hanover policy's escape clause was given effect, resulting in Hanover's escape from coverage. The Continental policy's pro rata clause was given effect, and, because there was no other coverage available due to Hanover's escape, Continental was required to cover the entire loss itself.
In Layton v. Land & Marine Applicators, Inc., 522 F.Supp. 679 (E.D.La.1981), the court was faced with similar escape and pro rata "other insurance" clauses as in Viger, 338 F.Supp. 808. For different reasons and in questionable reliance on Louisiana cases involving conflicting excess and pro rata "other insurance" clauses in which Louisiana courts have given effect to the excess clause, the court nevertheless reached the same result.[2]
In Efferson, 816 F.Supp. 1103, the court concluded that application of the escape "other insurance" clause in a West of England policy resulted in that coverage not being applicable because other insurance, an Aetna policy with a pro rata "other insurance" clause, also covered the loss. In applying the Aetna policy's pro rata clause, the court concluded that there was no other insurance coverage because of the operation of the West of England escape clause. Therefore, the Aetna coverage was determined to be solely applicable to the loss.
We discern from these federal cases which applied Louisiana law the general rules that (1) escape clauses and pro rata clauses are not mutually repugnant, and (2) when each is given effect in accordance with its particular language, the policy with the escape clause is allowed to escape coverage and the policy with the pro rata clause is burdened with the full extent of the loss. These cases provide valuable guidance. However, these cases are distinguishable from this case because they did not involve an escape "other insurance" clause which contained the added condition that, in order for the policy to escape coverage, the other insurance need be "valid and collectible" as well as "available" to the insured.
The issues presented by this assignment of error are whether the INA coverage provided to Citgo is actually self insurance and, if so, does this render the INA coverage outside the scope of the CNA policy's escape clause conditions, which would result in the CNA insurance being applicable and not escaping coverage. The resolution of the first issue, whether the INA coverage is self insurance, must be made with reference to the particular language of the INA policy.
The declarations page of the INA policy issued to Citgo provides for comprehensive general liability, contractual liability and employee benefits liability insurance coverage to Citgo as the named insured for an advance premium of $388,168.00. The policy period is from September 29, 1986 to September 29, 1987. Endorsement number sixteen provides for bodily injury and property damage liability limits of three million dollars per occurrence and three million dollars in the aggregate.
*169 Endorsement number seventeen to the policy provides, in pertinent part, as follows:
It is agreed that:
1. The Company's obligation to pay damages on behalf of the Insured under this policy applies only to damages in excess of the amounts of the Deductibles stated below:

 Amount
A. Deductible-Per Occurrence $3,000,000.
B. Deductible-Minimum Annual $ N/A
 Aggregate

. . . .
4. The Company shall have the right:
(a) to pay, at its sole discretion, any damages within the amounts of the stated Deductibles in the event that the Named Insured, or a Claims Servicing Organization acting on behalf of the Named Insured, fails to pay any damages within the applicable Deductible amount(s) after the legal obligation of the Insured to pay such damages has become definitely determined.
. . . .
(c) to pay any or all of the amount of the Deductible-Per Occurrence to effect settlement of any claim or suit.
5. The Named Insured shall have the duty:
(a) to pay damages covered under this policy up to the amount of the Deductible-Per Occurrence; provided, however, the Named Insured's total annual obligation for such damages shall be limited to the amount of the Deductible-Minimum Annual Aggregate....
(b) to cooperate with the Company to the extent required under the conditions of this policy.
(c) to reimburse the Company promptly for any part of the amount of the Deductible(s) paid by the Company.
. . . .
7. The Company shall have no duty to pay or contribute to any Loss Adjustment Expense as defined herein. The Named Insured shall pay all Loss Adjustment Expense in addition to the amounts of damages the Named Insured has a duty to pay up to the amount of the Deductible-Per Occurrence. The exhaustion of the Deductible-Minimum Annual Aggregate shall not relieve the Named Insured of the Named Insured's duty to pay all Loss Adjustment Expense.
Citgo asserts that the INA policy is actually self insurance because: the deductible-per occurrence is equal to the liability limit, Citgo is obligated to pay damages up to the deductible, INA is not obligated to but can pay damages under the deductible "at its sole discretion," and Citgo is obligated to reimburse INA if INA chooses to pay any such damages. Yeargin and CNA counter that the INA policy is not self insurance. They maintain that the INA policy provides all of the characteristics of insurance to Citgo and that the deductible equaling the liability limit is of no moment to a determination of whether the INA coverage is "collectible" and "available" to Citgo.
La.R.S. 22:5(1)(a) defines "insurance," in pertinent part, as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies..." Self insurance, within the context of comprehensive general liability insurance, is not specifically defined either in the Insurance Code or in the jurisprudence. We discern that the insurance arrangement between Citgo and INA was confected to provide Citgo with a written policy of coverages and exclusions and to allow for administration by INA.
Our review of the INA policy, particularly endorsement number seventeen, reveals that its language is clear and unambiguous. Pursuant to the wording of endorsement number seventeen, it is clear that, between Citgo and INA, Citgo itself was both primarily and ultimately liable for the first three million dollars in damages per occurrence. INA had no affirmative obligation to pay any of the damages under the *170 three million dollar deductible/liability limit. INA could choose at its discretion to pay these damages, and, if it did so, INA would then be entitled to prompt reimbursement from Citgo for any damages INA paid. This is not the same situation as if INA were obligated to first pay the damages and then seek reimbursement or indemnity from Citgo. Under any scenario, the first three million dollars in damages was ultimately going to be paid for by Citgo itself. For these reasons, we conclude that the INA policy constituted, in effect, Citgo's self insurance.
This self insurance was not "collectible insurance [that] is available to the Insured," as required by the terms of the CNA policy's escape "other insurance" clause. It was not "collectible" to Citgo because only Citgo was obligated to pay the damages itself and there was no right of indemnity or reimbursement from INA to Citgo under the policy. It was not "available" insurance to Citgo for the same reasons. In simple terms, between Citgo and INA, only Citgo paid. No money ever ultimately flowed to Citgo from INA under the coverage terms of the policy.
We conclude that the INA policy did not constitute "other valid and collectible insurance... available to the Insured," within the meaning and intendment of the CNA policy's escape "other insurance" clause. The application of the escape "other insurance" clause of the CNA policy results in the CNA insurance not escaping coverage and therefore applying to Citgo's damages.
On application of the CNA policy's escape "other insurance" clause, the trial court, for different reasons, decided that the CNA coverage applied because the conditions of the CNA policy's escape "other insurance" clause, which would have allowed the CNA insurance to escape coverage, were not met. Without thereafter analyzing the INA policy's pro rata "other insurance" clause, the trial court decreed that the CNA insurance covered the entirety of the first three million dollars in damages. The trial court erred in failing to expressly apply the provisions of the INA policy's pro rata "other insurance" clause.
Our interpretation of the CNA policy's escape "other insurance" clause resulted only in the CNA insurance not escaping coverage and being applicable because the INA insurance/Citgo self insurance was determined to not be "collectible" and "available" to the insured, Citgo. The application of the CNA escape clause did not result in the finding that the INA insurance/Citgo self insurance was not applicable to the loss. We must therefore apply the INA policy's "other insurance" clause.
We find that, in applying the INA policy's pro rata "other insurance" clause, both the INA insurance/Citgo self insurance and the CNA insurance apply on a primary basis. The CNA coverage, under the terms of the INA policy's pro rata "other insurance" clause, is "valid and collectible." However, the CNA policy does not provide for contribution by equal shares. Therefore, we must apply the "Contribution by Limits" subparagraph of the INA "other insurance" clause. The CNA policy has a five million dollar liability limit, and the INA policy has a three million dollar liability limit. CNA is responsible for five-eighths or 62.5 percent of the first three million dollars in damages, and Citgo is responsible for the remaining three eighths or 37.5 percent of the first three million dollars in damages. Thus, CNA must pay $1,875,000.00 and Citgo must pay $1,125,000.00 of the first three million dollars in damages.

ASSIGNMENT OF ERROR NUMBER FIVE
By this specification of error, Yeargin and CNA maintain that the trial court erred in concluding that CNA and U.S. Fire should share coverage on a fifty/fifty percent basis for the remaining $3,925,665.31 in settlement damages paid by Citgo and its insurers. U.S. Fire provided Citgo with excess general liability coverage for the three to five million dollar range of damages. The U.S. Fire policy's "other insurance" clause provided:
Other Insurance. If other collectible insurance including other insurance with this company is available to the insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit of liability hereunder) the insurance hereunder *171 shall be in excess of and not contribute with such other insurance.
This is clearly an excess "other insurance" clause. If possible, it must be reconciled with the CNA policy's escape "other insurance" clause, which reads as follows:
This insurance does not apply to the extent any other valid and collectible insurance is available to the Insured, whether on a contributory, excess or escape basis or otherwise, but this condition does not apply to insurance specifically purchased by the named insured to apply in excess hereof.
In construing the U.S. Fire policy's excess "other insurance" clause, the trial court reasoned as follows:
I find that the U.S. Fire policy and the CNA policy both amount to excess. So, CNA was responsible for two million dollars in excess over the three million dollars in coverage and that both U.S. Fire and CIGNA was [sic], and I find that they should contribute equally with regard to that excess, i.e., the amount of the claims over three million dollars. I think it's $3,900,000. I don't have the exact figure, but it's in the record. And they are to share equally with regard to that excess.
Generally, when faced with competing escape and excess "other insurance" clauses, the Louisiana courts have found them to be irreconcilable and mutually repugnant. Graves v. Traders & Gen. Ins. Co., 252 La. 709, 214 So.2d 116 (1968); Sledge v. Louisiana Dep't of Transp. & Dev., 492 So.2d 139 (La.App. 1 Cir.), writ denied, 494 So.2d 1176 (La.1986). The loss is then pro rated between the two insurers. Dette v. Covington Motors, Inc., 426 So.2d 718 (La. App. 1 Cir.1983).
In the present case, however, the two competing clauses are reconcilable. Application of the CNA policy's escape "other insurance" clause results in the CNA insurance escaping coverage because the U.S. Fire excess policy was valid, collectible and available to Citgo on an excess basis, all of which are criterion of the CNA policy's escape clause. Additionally, the U.S. Fire excess policy was purchased by Citgo and was not purchased by PCC, the named insured under the CNA policy, to apply in excess of the CNA coverage. Thus, the CNA insurance was not applicable to the loss. In applying the U.S. Fire policy's excess "other insurance" clause, because the CNA insurance escaped coverage by operation of the CNA policy's escape clause, there was no "other collectible insurance ... available to the insured covering a loss also covered hereunder [the U.S. Fire policy]...." Therefore, because no other insurance existed, the U.S. Fire policy solely covered the entire two million dollars of damages in the three million to five million dollar loss range. In the end, the insured, Citgo, was not left without coverage. The trial court's conclusion that the CNA insurance and the U.S. Fire insurance each provided fifty/fifty percent excess coverage for the $3,925,665.31 in damages above the three million dollar mark was erroneous.
Above the five million dollar mark, only the CIGNA excess umbrella policy provided Citgo with coverage. Thus, CIGNA is solely liable for the $1,925,665.31 in damages paid in settlement above the five million dollar point.
In summation, we conclude that the principal amount owed by CNA, pursuant to its coverage of Citgo as an "additional insured," for its share of the settlements entered into by Citgo, INA, U.S. Fire and CIGNA, is $1,875,000.00. This amount represents five-eighths or 62.5 percent of the first three million dollars in damages.

ASSIGNMENT OF ERROR NUMBER SIX
Yeargin and CNA assert that the trial court erred in concluding that CNA had a duty as a primary insurer of Citgo to defend Citgo from the claims made by the personal injury claimants. Appellants also maintain that the trial court erred in holding CNA liable for Citgo's defense costs of $243,698.05.
The issue of whether an insurer has a duty to defend suits filed against its insured is determined by the facts alleged in the claimant's petition. The insurer is obligated to furnish a defense unless the claimant's petition unambiguously excludes coverage. *172 The obligation to defend is accordingly broader than the obligation to provide coverage for claims. Assuming all of the petition's allegations are true, if there is both coverage pursuant to the policy and the insured's liability to the plaintiff, the insurer is required to defend the insured regardless of the suit's outcome. Steptore v. Masco Const. Co., 93-2064 (La.8/18/94); 643 So.2d 1213. The insurer is obligated to provide the insured with a defense even though the insured may ultimately be found not liable to the claimant. Allen v. Keeney, 532 So.2d 521 (La.App. 1 Cir.1988).
We have in this opinion determined that CNA was a primary insurer of its "additional insured," Citgo. The CNA policy itself provides that
the Company shall have the right and duty to defend any suit against the insured seeking damages on account of personal injury or property damage, even any of the allegations of the suit are groundless, false or fraudulent, ...
This language is extremely broad and incorporates the insurer's duty under the applicable law discussed above. We have reviewed the petitions of the personal injury claimants, the complete case records of which are included in the record on appeal. We find that in no instance do the factual allegations of the claimants' petitions unambiguously exclude coverage. Therefore, as a primary insurer, CNA was obligated to defend Citgo. However, CNA was not alone in its obligation to defend Citgo. Under the terms of the INA policy, with reference to the allegations of the claimants' petitions, INA likewise had a right and duty to defend Citgo. However, endorsement number seventeen to the INA policy provided that Citgo was required to bear the cost of defense, i.e., "loss adjustment expense." Therefore, Citgo's self insurance under the INA policy required Citgo to provide for its own defense.
We conclude that CNA had a duty to defend Citgo and that Citgo had a duty to defend itself. The trial court's determination that CNA was solely obligated to defend Citgo was erroneous. We apportion the obligation to pay Citgo's defense costs, in proportion to the liability limits of the CNA policy and the INA policy, as follows: five-eighths to CNA and three-eighths to Citgo. Therefore, CNA was obligated to pay $152,311.28 and Citgo itself was obligated to pay $91,386.77 of the $243,698.05 in defense costs incurred by Citgo. The principal amount of defense costs which the trial court decreed CNA to be liable for shall be reduced from $243,698.05 to $152,311.28.

ASSIGNMENT OF ERROR NUMBER SEVEN
In this assignment of error, Yeargin and CNA assert that the trial court erred in limiting the jury interrogatory to the reasonableness of the personal injury settlements and rejecting CNA's requested special jury interrogatories. The first part of this specification of error is substantively related to assignments of error numbers one and two, which deal with the trial court's failure to allow the jury to decide the issue of coverage and its conclusion that PCC agreed to obtain and did obtain coverage for Citgo as an "additional insured" under the CNA policy. We have previously dealt with the first assignment of error and found it meritorious, but we erred in failing to address the remaining assignments of error in accordance with the rule of Gonzales, 320 So.2d 163. The first part of this assignment of error is therefore moot.
At trial, CNA requested that the jury interrogatories allow the jury to allocate the amount of damages paid by Citgo between punitive and compensatory damages. Additionally, CNA suggested an interrogatory concerning insurance coverage for the operation of the Citgo refinery during turnaround operations and an interrogatory on the statutory employer issue. The trial court denied CNA's requests, and CNA objected to this ruling.
This issue is governed by La. Code Civ.P. art. 1812. Within the guidelines of this article, the trial court is vested with broad discretion in determining whether to submit special interrogatories to the jury. Black v. Prudential Prop. & Cas. Ins. Co., 93-878 (La.App. 3 Cir. 3/2/94); 634 So.2d 1340. It also has wide discretion in the *173 framing of the questions to be posed to the jury. Bell v. Vickers, 568 So.2d 160 (La.App. 2 Cir.1990). Absent a showing of abuse of that discretion, an appellate court may not set aside such determinations. Tramontin v. Glass, 95-774 (La.App. 5 Cir. 1/30/96); 668 So.2d 1252.
We have reviewed CNA's requested special interrogatories and compared them to the interrogatories given by the trial judge to the jury. We conclude that the trial court did not abuse its discretion in declining to give to the jury the special interrogatories requested by CNA.

ASSIGNMENT OF ERROR NUMBER EIGHT
Yeargin and CNA specify as error the trial court's exclusion from evidence of CNA's reasons for refusing to defend Citgo while at the same time allowing the jury to decide whether CNA's refusal was reasonable or arbitrary and capricious. However, Yeargin and CNA did not brief this assignment of error. Pursuant to the Rule 2-12.4 of the Uniform Rules-Courts of Appeal, we consider this assignment of error as having been abandoned by appellants.

ASSIGNMENT OF ERROR NUMBER NINE
Yeargin and CNA next contend that the trial court erred in rendering a directed verdict in favor of St. Paul, the insurer of the Lake Charles Electric Company, on the issue of coverage. Two Lake Charles Electric Company's employees were injured in the fire. Yeargin and CNA named St. Paul as a third-party defendant, alleging that St. Paul provided coverage to Citgo as an "additional insured," subject to the condition that St. Paul would not cover "any act or failure to act of [Citgo] ... other than the general supervision of work done by [Lake Charles Electric Company] for [Citgo]." Citgo paid over $900,000.00 in settlement to the two injured Lake Charles Electric Company employees. Citgo did not seek indemnity from the Lake Charles Electric Company or coverage from St. Paul.
CNA's third-party demand sought indemnity and/or contribution from St. Paul, asserting that "general supervision" included Citgo's failure to maintain a safe workplace and its failure to protect the contractor's employees from hazards. On appeal, CNA contends that the trial court erred in directing a verdict in favor of St. Paul.
In countering appellants arguments on appeal, St. Paul contends that the directed verdict was properly granted because Yeargin and CNA presented no proof that the fire resulted from Citgo's "general supervision" of the Lake Charles Electric Company's work, a requirement of the St. Paul policy.
The standard for the evaluation of a motion for directed verdict is embodied in La.Code Civ.P. art. 1810. The assertion of a motion for directed verdict presupposes that the issue on which the motion is sought will be presented to the jury. The motion may be granted by the trial judge, after weighing all evidentiary inferences in a light most favorable to the opponent to the motion, if it is clear that the facts and inferences are overwhelmingly in favor of the mover such that reasonable men could not reach a contrary verdict. Burris v. Wal-Mart Stores, Inc., 94-0921 (La.App. 1 Cir. 3/3/95); 652 So.2d 558, writ denied, 95-0858 (La.5/12/95); 654 So.2d 352.
This set of circumstances was not present in this case. The jury was not to decide whether the St. Paul policy provided coverage to Citgo under the particular facts presented. In this situation, the proper procedural vehicle was a motion for involuntary dismissal "on the ground that upon the facts and law, the plaintiff has shown no right to relief." La.Code Civ.P. art. 1672(B). The judge is then required to evaluate all the evidence, without any special evidentiary inferences in favor of the mover's opponent, and grant the involuntary dismissal if the nonmover has failed to establish proof by a preponderance of the evidence. Crowell v. City of Alexandria Through Snyder, 558 So.2d 216 (La.1990). The granting of a motion for involuntary dismissal is not reversible in the absence of manifest error. Continental Ins. Co. v. Three Seasons Pest Control Co., 94-1094 (La.App. 3 Cir. 2/1/95); 649 So.2d 1220.
*174 Although St. Paul's motion was couched in terms of a directed verdict, St. Paul actually technically moved for involuntary dismissal because the issue of coverage under the St. Paul policy was to be decided by the judge. St. Paul urged that no shred of evidence was presented tending to show that Citgo's general supervision of the Lake Charles Electric Company played any role in causing the accident. The trial court concluded that the motion was meritorious, reasoning that the "unsafe workplace" analysis did not result in coverage under the policy.
Our review of the evidence reveals that, under either the involuntary dismissal standard or the directed verdict standard, the trial court did not err in granting St. Paul's motion. Yeargin and CNA failed to produce any credible evidence tending to show that the St. Paul policy provided coverage to Citgo for this accident. Therefore, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TEN
By this final assignment of error, Yeargin and CNA assert that the trial court erred in denying them the right to proffer the deposition testimony of Dr. Robert Felton and denying them the use of Dr. Roy Wright's deposition to impeach Dr. Wright's trial testimony.
At trial, during the presentation of its case, Yeargin attempted to enter into evidence the deposition of Dr. Felton, an insurance expert retained by Citgo. Citgo objected on the ground that it had not called Dr. Felton, its witness, to testify in its case and would not call him to testify in rebuttal. Citgo asserted that Yeargin was precluded from using the deposition to impeach a witness who was not going to testify at trial. The trial court ruled that the deposition was not admissible and did not allow Yeargin to proffer the deposition into evidence. Yeargin contends this was error.
La.Code Civ.P. art. 1636(A) provides:
When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.
The use of the word "shall" denotes that this provision is mandatory. The trial court is required to allow the party to proffer the evidence ruled inadmissible. In briefs, the parties are in agreement that the trial court's failure to allow the proffer was error. The trial court erred in not allowing Yeargin to proffer the deposition. However, we conclude that this error was minor in relation to the entirety of the evidence adduced and surely did not affect the outcome of the trial. Dr. Felton's deposition testimony apparently concerned purported ambiguities in the insurance coverage. We have found that the insurance provisions which are pertinent to the final resolution of this case are not ambiguous. Therefore, this error was harmless.
Yeargin was not allowed to impeach Dr. Wright's trial testimony by using his deposition because, although at the taking of the deposition he reserved the right to "read and sign" his deposition, he was never sent a copy to review. He therefore did not "read and sign" the deposition. Dr. Wright was a former Citgo contract negotiator who acted as the lead negotiator for Citgo in the Citgo-PCC negotiations. When Yeargin's counsel attempted to impeach Dr. Wright, Citgo objected. The trial court sustained the objection. Yeargin was allowed to proffer the deposition.
The substance of the impeachment testimony concerned whether the turnaround contract was negotiated on the premise that the turnaround operations would be conducted on a "live" working unit. At trial, Dr. Wright answered this question affirmatively. In his deposition, Dr. Wright commented that to keep the unit "live" during turnaround would be absurd and foolhardy. He also said that he had never seen a turnaround operation performed on a "live" unit.
Generally, at trial, any deposition can be used by any party to contradict or impeach the testimony of the deponent as a witness. La.Code Civ.P. art. 1450(A)(1). Article 1445 provides:
When the testimony is fully transcribed the deposition shall be submitted to the *175 witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness unless the parties by stipulation waive the signing or the witness is ill or is absent from the parish where the deposition was taken or cannot be found or refuses to sign. If the deposition is not signed by the witness within thirty days of its submission to him, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed unless on a motion to suppress under Article 1456 the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part. A video deposition does not have to comply with the requirements of reading and signing by the deponents. (Emphasis added.)
Article 1456, referred to in the above article, provides:
Errors and irregularities in the manner in which the testimony is transcribed or the deposition is prepared, signed, certified, sealed, endorsed, transmitted, filed, or otherwise dealt with by the officer under Articles 1437 through 1449 are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained. (Emphasis added.)
No motion to suppress appears in the record. Thus, Citgo waived any objection based on Dr. Wright's failure to read and sign the deposition. The trial court should have allowed Yeargin to use the deposition for impeachment purposes. The record further indicates that, after the deposition was taken, a transcript thereof was sent by the court reporter to Citgo's counsel. Dr. Wright was not personally sent a copy of the deposition transcript by the court reporter, and Citgo's counsel also failed to forward a copy to Dr. Wright.
Clearly, the trial court erred in not allowing Yeargin's counsel to use Dr. Wright's deposition to impeach his testimony. Dr. Wright's trial testimony took place before the trial judge only, and the error did not affect the jury verdict. We have read the entire deposition proffered into the record. We conclude that the trial court's exclusion of this impeachment evidence, when viewed in context of the record as a whole, surely had no effect on the outcome of the trial. The error is therefore harmless.

DECREE
For the above and foregoing reasons, we affirm in part, reverse in part, and amend the trial court's judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that CNA's obligation for settlements entered into by Citgo, INA, U.S. Fire and CIGNA is reduced from $4,964,332.66 to $1,875,000 plus interest from the date of judicial demand until paid.
IT IS ORDERED, ADJUDGED AND DECREED that CNA's obligation for costs of defense is reduced from $243, 698.05 to $152,311.28 plus interest from the date of judicial demand until paid.
IT IS ORDERED, ADJUDGED AND DECREED that CNA's total obligation under this amended judgment is subject to the five million dollar credit for settlement of Citgo's contractual indemnity claim against Yeargin.
In all other respects, the judgment is affirmed. Costs of this appeal are to be paid by Citgo Petroleum Corporation.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND RENDERED.

ON REHEARING
We have granted Citgo Petroleum Corporation's application for rehearing for the limited purpose of clarifying the issue of legal interest. Our opinion decreed that "CNA's obligation for settlements entered into by Citgo, INA, U.S. Fire and CIGNA is reduced *176 from $4,964,332.66 to $1,875,000.00 plus interest from date of judicial demand until paid." We also held that CNA's obligation for costs of defense is subject to interest from judicial demand until paid. Mover correctly points out that the "date of judicial demand" is different for each of the originally settled cases filed by the injured claimants. Therefore, we amend the prior decree and order that CNA's obligation is subject to legal interest from the particular dates of judicial demand of each personal injury claimant's suit.
In all other respects, Citgo's motion for rehearing is denied.
NOTES
[1] Berry, 488 So.2d 934, was legislatively overruled by Act number 454 of 1989, effective January 1, 1990. Because the accident in question occurred in 1987, the factors of Berry apply. Richard v. Teague, 92-17 (La.App. 3 Cir. 5/4/94); 636 So.2d 1160, writ denied, 94-1934 (La.11/11/94); 644 So.2d 388.
[2] The Layton court relied on Juan v. Harris, 279 So.2d 187 (La.1973) and O'Brien v. Traders & General Ins. Co., 136 So.2d 852 (La.App. 1 Cir. 1961), two factually different cases insofar as the types of "other insurance" clauses were concerned.