700 So.2d 1285 (1997)
Charles Patrick KELLER and Constance B. Keller
v.
CITY OF PLAQUEMINE, Plaquemine Police Department, and Mackie Bonnette.
No. 96 CA 1933.
Court of Appeal of Louisiana, First Circuit.
September 23, 1997.
*1287 F. Charles Marionneaux, F. Barry Marionneaux, Plaquemine, for Plaintiffs/Appellees Charles P. Keller and Constance B. Keller.
Bradley C. Myers, John F. Jakuback, Paul A. Holmes, Baton Rouge, for Defendants/Appellants City of Plaquemine, Plaquemine Police Department and Mackie Bonnette.
Before LeBLANC and FITZSIMMONS, JJ., and TYSON,[*] J. Pro Tem.
LeBLANC, Judge.
This is an appeal of a judgment rendered in favor of Charles P. Keller, a former deputy with the Iberville Parish Sheriff's Department, for injuries sustained by Keller while in the course of making a felony stop of a suspect vehicle and its occupants. The trial court found that Keller's injuries were caused by the negligence of Mackie Bonnette, a sergeant with the City of Plaquemine Police Department, who assisted in making the felony stop. Further, the trial court found the City of Plaquemine and the police department vicariously liable for the negligence of Bonnette as well as its own negligence for failing to adequately train Bonnette and for failing to establish procedures concerning pursuit and emergency driving. A judgment in the amount of $368,827.90, together with legal interest, costs and expert fees was rendered against Bonnette, the City of Plaquemine, and the Plaquemine Police Department (hereinafter referred to collectively as "defendants") in favor of the plaintiffs, Charles Keller and his wife, Constance. Defendants appeal the judgment assigning error to the imposition of liability as well as the amount of damages. Plaintiffs answered the appeal, asserting that the amount awarded to Mrs. Keller for her loss of consortium was insufficient and also assigning error to the trial court's ruling that the "Professional Rescuer's Rule" is a viable affirmative defense in Louisiana law.

BACKGROUND FACTS
During the early morning hours on November 3, 1993, Deputies Charles Keller and Rory Vaughn and police sergeant, Mackie Bonnette were working patrol in Plaquemine, Louisiana. The three men met at the Iberville Glass Company where Keller related to Vaughn and Bonnette that he had just left the scene of an incident at a bar involving the occupants of a white Ford, whom he had instructed to leave the area and return to Baton Rouge. As Keller was relating the incident, the three men heard between six and eighteen gunshots and immediately received a dispatch of a drive-by shooting in the area. Keller stated he suspected the shots came from the occupants of the white Ford which had been causing trouble at a bar. Keller, Vaughn and Bonnette split up and left in search of the suspect vehicle.
Shortly thereafter, Deputy Vaughn radioed that he had spotted, and was in pursuit of the white Ford travelling north on Louisiana Hwy. 1. Keller responded to Vaughn that he was on his way, and advised Vaughn not to pull over the vehicle until he arrived to assist with the stop. With Keller a few seconds behind, Vaughn initiated the stop of the white Ford approximately six tenths of a mile north of the traffic signal at the Dow Chemical Plant, north of Plaquemine's city limits, by directing the suspects to pull onto the right shoulder of the highway. (This area of Highway 1 is four-lane, divided by a *1288 grassy median; there are full shoulders on both sides, and a ditch to the immediate right side of the right shoulder.) Vaughn positioned his vehicle approximately twenty feet behind the Ford, partially in the right hand lane of travel. Keller positioned his vehicle parallel to Vaughn's unit, straddling the dashed center line, and slightly angled toward the suspect vehicle to provide illumination to that area. Keller armed himself with a shotgun and positioned himself in a semi-crouch stance behind the opened driver's door of his vehicle; Vaughn, armed with a pistol assumed the same stance behind the door of his own unit. Both men drew their weapons and focused their attention on the suspects. As Keller began to direct the suspects out of their vehicle by way of a hand-held loudspeaker, Officer Bonnette, who, also had responded to the dispatch, heard a radio transmission indicating the suspect vehicle had been stopped by Deputies Keller and Vaughn, and proceeded to the scene of the stop to assist in arresting the suspects. According to Keller and Vaughn, they could hear a vehicle approaching rapidly, skidding and screeching as though it were out of control. According to both Keller and Vaughn, the skidding sounds indicated to them that the vehicle was headed toward the rear or left side of Keller's vehicle. Fearing he may be hit by the approaching vehicle, Keller dropped his shotgun and dove into the front seat of his unit. As a result of this evasive maneuver, Keller sustained a back injury; this litigation ensued.

NEGLIGENCE OF MACKIE BONNETTE
Plaintiffs claim Bonnette was negligent (i.e., breached his duty to exercise reasonable care) in the manner in which he responded to the felony stop scene in that he acted without due regard for the safety of his fellow officers, namely, Deputies Keller and Vaughn, and also in that he deviated from his prior training with regard to making felony stops, without first communicating this intention to the other officers at the scene. The first step in applying the duty-risk analysis in this matter is a determination of the duty owed by Bonnette, as a police officer, to Keller. Generally, a police officer, in carrying out his authority to enforce laws, has the duty to act reasonably to protect life and limb, to refrain from causing injury or harm, and to exercise respect and concern for the well being of those he is employed to protect. See Syrie v. Schilhab, 96-1027, p. 5 (La. 5/20/97); 693 So.2d 1173, 1177. Furthermore, with regard to operating an authorized emergency vehicle when responding to an emergency call, or when in pursuit of an actual or suspected violator of the law, a police officer has the duty to drive with due regard for the safety of all persons. La.R.S. 32:24(D). Moreover, in effectuating an arrest, police officers have the duty to act reasonably and the force used must be limited to that required under the totality of the circumstances; the reasonableness of an officer's actions depends upon the totality of the facts and circumstances of each case. Mathieu v. Imperial Toy Corporation, 94-0952, p. 5-6 (La. 11/30/94), 646 So.2d 318, 322. Finally, an officer's actions need not be the "best" method of approach; instead, the standard of care requires choosing a course of action which is reasonable under the circumstances. Mathieu, 94-0952 at p. 10, 646 So.2d at 325. In addition to the foregoing legal precepts, the record contains the expert testimony of Melissa Wright, program director for the BASIC Academy at the L.S.U. Law Enforcement Training Program, and the testimony of Larry Allen Gould, former Louisiana State Trooper accepted as an expert in felony stop and arrest procedures for high speed driving. The testimony of both of these experts establishes an officer's duties, particularly in light of a felony stop involving high speed driving.[1]
Ms. Wright testified that she has taught various classes at the academy, including vehicle stop procedures, defensive tactics, and officer response, safety and survival. However, the training is limited to classroom instruction due to the lack of funding and appropriate facilities; there is no "hands-on driving" at the academy. Ms. *1289 Wright testified that one of the fundamental duties of a police officer is to act reasonably and prudently, and to act with concern for the safety of others, including fellow police officers. Given the nature of the work, police officers are given the discretion to deviate from trained procedures when and if the circumstances require. However, given that all officers will be expecting and relying on other officers to respond according to trained procedure, when such deviation is warranted by the circumstances, communication of such deviation to all other officers involved is imperative to prevent distraction of other officers on the scene and to ensure orderly and safe operations. Specifically with regard to the procedure for making felony vehicle stops when more than one officer responds, Ms. Wright testified that the preferred method taught at L.S.U. is employed to meet the primary goals of illuminating the suspect vehicle, creating a wall of light behind the suspects, providing cover for the officers, and enabling observations and communications among the officers. She described the preferred procedure as follows:
The suspect vehicle should be pulled to the shoulder or as close to the shoulder as possible. The primary unit [first arriving officer] should be pulled in behind as close to behind ... straight behind him as possible. The second unit at the scene should be either parallel to the primary unit or angled to thebeside the primary unit.... The third responding officer or the second backup officer is taught to respond to pull in behind the primary vehicle or the first vehicle on the scene.
Although the preferred method is the only one in which the officers at L.S.U. BASIC are trained, Ms. Wright distributes materials to her classes containing other methods for making felony stops which may be employed depending on the circumstances (i.e., existing road conditions, terrain and environmental conditions), provided they are safe and reasonable. Ms. Wright was questioned regarding the propriety of Bonnette's actions, given the facts and circumstances on the night of November 3, 1993; she stated that Bonnette's actions were in direct violation of his prior training, in that he did not position his vehicle according to the preferred method, nor did he communicate to the other officers of his intended approach. Furthermore, she testified that it is unreasonable for a police vehicle to skid or slide into any position. Finally, in her opinion, the method employed by Bonnette in arriving at the scene of the felony stop was unreasonable in that it did little to accomplish the desired goals of proper illumination and ensuring the maximum cover for all officers involved.
Larry Gould, accepted as an expert in high speed driving felony stops and arrest procedures, concurred with Ms. Wright's list of primary goals in the basic training regarding felony stops, namely cover, separation of officers and surveillance, light control (or illumination), maneuverability, field of fire, efficient arrest procedures and perimeter control. However, unlike Ms. Wright, Mr. Gould testified that there is not one preferred method, because "every set of circumstances could lend to a separate set of responses." Thus, according to Mr. Gould, his trained officers would not be expected to employ one particular method, rather, they are expected to use judgment and act reasonably. Furthermore, unlike Ms. Wright, Mr. Gould did not place as high a value on actual communication among officers, opining that too much radio transmission could be distracting and cause confusion. Also contrary to the opinion of Ms. Wright, Mr. Gould did not think Bonnette's speed or the fact that his vehicle skidded was unreasonable, since "he was thinking about what he was doing ... [a]nd he arrived where he stated that he wanted to be." Although Mr. Gould admitted it is undesirable for a vehicle to skid, it was his opinion that since Bonnette ended up where he intended, then he couldn't have been out of control. Finally, Mr. Gould was of the opinion that Bonnette acted reasonably under the circumstances.
Bonnette testified that in approaching the felony stop scene, he was in control of his vehicle at all times and that his vehicle ended up in the position he intended. Although he admitted that he did not intend for the vehicle to skid, his recollection was that the skidding lasted only a split second, and that this did not occur until after he had passed Keller's vehicle, when the tires of his own *1290 unit hit some gravel or debris on the roadway. According to Bonnette, he heard radio communication that Vaughn and Keller had stopped the white Ford, and, since he was already heading north on Highway 1, he turned on his lights and sirens and proceeded at high speed toward the scene of the stop. As he approached Dow Chemical, he could see Deputies Vaughn's and Keller's units ahead with their lights on and they appeared to be side by side. When he reached Dow Chemical, he was travelling at approximately 90 mph; at that point, he turned off his siren and began decelerating. According to Bonnette, he decided to position his vehicle in a manner differently than the preferred manner in which he was trained because he noticed a grassy ditch area to the right of Vaughn's vehicle and because he felt that directing his car to the left of Keller's vehicle would place him in a better position to illuminate the area and provide cover for himself as well. Bonnette admitted that he calculated this decision on his own and he did not radio ahead to alert Deputies Vaughn and Keller of his arrival or to inform him that he was directing his vehicle to a resting place other than the way in which they were trained. Finally, Bonnette testified that he did not know how close he came to Keller's vehicle, although when he approached the scene, he could see Keller's car door opened and he assumed Keller was in his "take cover" stance behind the opened car door.
Deputy Vaughn testified that he initiated the stop and positioned his vehicle in the manner in which he was trained, directly behind the suspect vehicle, on the shoulder of the road. He then armed himself with his weapon and assumed his stance behind his opened car door. As Keller began to direct the suspects out of their vehicle, Vaughn heard another car coming toward them from behind which sounded to him like a Chevrolet at "high rev" as though it were "tacking out". He heard repeated screeching sounds and tires skidding across the pavement. Vaughn testified that he assumed the vehicle was another officer coming to assist in the stop and accordingly, he expected that vehicle to pull up behind his vehicle on the shoulder, according to the procedure in which he was trained. However, the vehicle sounded as though it was coming around Vaughn's left side, skidding and sliding up until the time it stopped; thus he thought it was out of control. Nevertheless, because the vehicle sounded to be headed away from him, he did not feel it necessary to protect himself and he maintained his focus on the suspect vehicle ahead.
Keller also testified that he could hear a vehicle accelerating rapidly toward the scene; he too, assumed it was another officer coming to help. He testified that he heard the siren stop, then he heard braking, skidding, sliding and screeching. The vehicle sounded as though it were coming straight at him, and because he would have had to stand up to see behind him, thereby exposing himself to the suspects, Keller opted to take evasive action by diving into his own vehicle. When he did so, he heard the approaching vehicle slide past him, within one foot of his opened car door. Bonnette's vehicle ended up slightly ahead, and to the left of Keller's vehicle, angled toward the suspect vehicle. Keller, too, testified that he expected the vehicle to pull up directly behind Vaughn's vehicle according to their prior training, but by the sounds of it, he thought it was out of control and headed toward him instead.
Based on the foregoing, the trial court concluded that Officer Bonnette breached his duty to act with due regard for the safety of other people, stating, "[t]here was no valid reason why Bonnette did not warn of his approach and intended positioning by radio.... Bonnette should have informed the officers on the scene of his impending approach and his intended set-up at the scene." Additionally, the trial court noted that Bonnette's approach to the scene of the stopped vehicles was "reckless," and it precipitated distraction and endangerment, which Bonnette had a duty to avoid. The trial court further found that Bonnette's breach of such duty caused Keller to take evasive action which the court deemed "reasonable under the circumstances,"[2] resulting in injuries to *1291 Keller's back. Finding that the risk of harm to a fellow police officer during a vehicle stop is within the scope of an enforcement officer's duty to drive with due regard for the safety of others, the trial court held Bonnette liable for the injuries sustained by Keller as a result of his evasive maneuver.
On appeal, defendants assert the trial court erred in finding Bonnette was negligent in his approach to the felony stop, arguing that the evidence established that the positioning of Bonnette's vehicle and the speed at which he approached the scene were not unreasonable under the circumstances. At the outset, we note that, although the trial court found Bonnette's speed to be unreasonable and the positioning of his vehicle violated his prior training, its finding of negligence was based, not on these two facts, but on Bonnette's failure to communicate his intentions to the other officers, who were reasonably expecting and relying on the other officer to respond according to trained procedures in the absence of communication indicating otherwise. While we agree with the trial court that Bonnette's failure to communicate constituted negligence under the circumstances, we note also that at least one expert, Ms. Wright, opined that Bonnette's actions were unreasonable per se (i.e., even if such had been communicated); thus, even if the trial court's holding was based on this finding, such would amount to a credibility determination supported by the record, which we may not disturb absent manifest error. Thus, whether because of the positioning of Bonnette's vehicle, the speed of his arrival, his failure to communicate his intentions to the other officers, or a combination of all of these factors, the record supports the trial court's conclusions that Bonnette's actions constituted actionable negligence on his part.

NEGLIGENCE OF THE CITY OF PLAQUEMINE
The trial court also found that Bonnette was acting within the scope of his employment at the time of his tortious conduct; thus, the City of Plaquemine was held vicariously liable for Bonnette's negligence, pursuant to La.C.C. art. 2320. The trial court also imposed liability on the City of Plaquemine for its own negligence for failing to adequately train Bonnette and in failing to establish policies and procedures for pursuit and emergency driving. Defendants assign error to this finding citing a lack of evidence in the record that the training of the police department was deficient. A municipal employer which arms police officers has a duty to exercise reasonable care in hiring, training and retaining its officers to perform their functions with due regard for their own safety, as well as the safety of others. See Roberts v. Benoit, 605 So.2d 1032, 1038 (La. 1991). While there is some evidence in the record to support the factual finding that the City of Plaquemine failed to adequately train officer Bonnette in high speed pursuit driving, we need not analyze the sufficiency of that evidence or the propriety of this finding because, as a matter of law, the City is independently liable for the negligence of its employee, pursuant to La.C.C. art. 2320. Defendants do not contest the imposition of liability against the city based on the negligence of its employee, other than to argue that the employee was not negligent. Having already found support in the record that Bonnette was negligent, and because he was clearly within the course and scope of his employment, the city is vicariously liable as a matter of law. Thus, we need not determine if the trial court erred in imposing liability on the additional basis of failure to train.

DAMAGES
The trial court awarded the following amounts in damages:

Past Medical Expenses: $ 3,827.90
General Damages: $ 125,000.00
Loss of Consortium: $ 5,000.00
Future Lost Income: $ 210,000.00
Past Lost Income: $ 25,000.00

*1292 Defendants assign error to the awards for past lost wages and future lost wages. While they do not dispute that Keller is disabled, they contend plaintiffs have failed to prove that the back injury caused his disability. Rather, they maintain, the record establishes that the back injury was not disabling and that Keller's disability is the result of his subsequently contracted cancer. Thus, while the issue is couched in terms of damages, the legal question is one of causationdid the back injury resulting from Mackie Bonnette's negligence render Keller disabled? Our duty on appeal is to determine if the record supports the trial court's conclusion that, albeit the cancer, Keller was disabled as a result of the back injury and entitled to past and future lost wages.

A. Keller's Back Injury
Keller was 29 years old at the time of this incident which occurred on November 3, 1993. The record reveals that the back injury sustained by Keller as a result of his diving into his vehicle was immediately manifest. Keller testified that he felt an immediate "pop" and the onset of intense pain in his back as he dove onto the seat. He also struck the steering wheel with his left shoulder. The pain in his back was so intense that when he resumed his position to apprehend the suspects, he was unable to lift his shotgun. He gave the gun to Officer Bonnette, and proceeded with his duties in the arrest as best he could, albeit in great pain. As Keller and Vaughn were handcuffing the suspects, Keller commented to Vaughn that he had injured his back when he jumped into his vehicle. Again, at the jail, Keller complained of progressing back pain. Unable to complete his paperwork, Keller attempted to relieve the pain by laying on a hard Formica countertop. Approximately twenty to thirty minutes later, the pain was worsening and Deputy Vaughn carried Keller to his vehicle and followed him to River West Medical Center, where Vaughn again carried Keller from his vehicle into the emergency room. Keller was diagnosed with "lumbosacral strain caused by rapid motion," given pain medications and muscle relaxers, and released with instructions to continue the medications, get bed rest and to follow-up with a treating physician in two days, or to return to the emergency room if his symptoms worsened. Later that day, unable to get relief, Keller saw chiropractor, Nancy Marshall, who took x-rays and examined him. Marshall concluded that Keller had "severe hypolordosis of the normal lateral curve ... decrease[d] disc space at posterior aspect of L5/S1, indicating disc herniation." Keller received muscle stimulation from Marshall from November 3, 1993 through December 17, 1993 in attempts to get some relief from his back pain. Keller's physician, Dr. Gremillion, referred him to neurosurgeon, Dr. John Clifford, who examined Keller on November 10, 1993 and suspected an "acutely extruded disc." Dr. Clifford ordered diagnostic testing which revealed a "midline L4 disc with some compression of the thecal sac," and "focal protrusion of the L5 disc." Dr. Clifford prescribed outpatient traction and physical therapy for four weeks; however, on December 2, 1993, Keller returned to see him with complaints of his back pain worsening with the prescribed therapy. Dr. Clifford saw Keller again on January 24, 1994. Keller had discontinued the physical therapy due to the worsening of his symptoms and continued to complain of low back and left leg pain. Although Dr. Clifford's examination revealed the previously noted disc herniation, he noted that Keller had "managed to do some deer hunting in the interim, as well as able to crawl under his house to run a cable wire." Based on the foregoing, Dr. Clifford concluded that Keller had "reached maximum medical improvement at [that] point in time" and released him to return to work as of January 31, 1994.[3]
There is no further evidence in the record regarding Keller's back injury until a visit to *1293 Dr. Clifford on January 3, 1996 wherein Keller reurged his prior complaints of low back and leg pain which interfered with his day to day activities from time to time. Dr. Clifford's examination revealed the continued presence of the 1993 disc herniation. Dr. Clifford opined that Keller's complaints of back pain were "quite real" and assigned a 10% disability for Keller's back injury. He concluded there was not much to offer Keller by way of medical treatment for his back, other than some physical therapy, due to his other myriad of medical problems (which are discussed below), which prevent him from being a surgical candidate. Dr. Clifford stated that in the absence of surgical intervention, Keller would continue to suffer persistent pain and intermittent problems with his back.

B. Keller's Cancer
On July 22, 1994, approximately eight months following the back injury, Keller noticed a swollen lymph node in his neck. He sought treatment from Dr. Jack Breaux and was treated with steroids and antibiotics through the end of August. On August 25, 1994, a CT scan of the neck revealed a mass; on August 30, 1994, a biopsy confirmed cancer. (He was diagnosed with a stage T1N3 lymphoepithelioma of the nasopharynx.) Keller was initially evaluated at M.D. Anderson Hospital in Houston, Texas on September 15, 1994, and on September 20, 1994, he began his first cycle of chemotherapy. He received a second cycle of chemotherapy on October 13, 1994, and on November 7, 1994, he completed the third cycle. He was discharged from M.D. Anderson on November 8, 1994. On November 16, 1994, Keller initiated radiation therapy at Mary Bird Perkins Cancer Center in Baton Rouge. On December 15, 1994, Keller began to experience complications as a result of the radiation, and was admitted to the hospital for the insertion of a PEG tube (alternative tube-feeding support), which he still had at the time of trial, on January 30 and 31, 1996. Keller completed radiation therapy on January 13, 1995; however, he suffered numerous complications, including bilateral pneumonia and recurring dilation of the esophagus for which he was hospitalized and underwent numerous esophageal dilations. Although at the time of trial, Keller was still suffering from the complications of his cancer, the last notation in his medical records regarding his condition is a letter written by his treating oncologist, Dr. Robert Fields, which states, "[h]e (Keller) is currently off antibiotics and is actually feeling quite well but still having some moderate pain which he controls with Lortab and small amounts of Demerol. He has fairly normal activity and continues to hunt.... examination of the nasopharynx reveals no evidence of recurrent tumor.... the dilations of the lower pharynx will not resume until the first or second week in January, after hunting season." A prior notation by Dr. Fields, dated September 19, 1995, indicates Keller's continuing difficulties with swallowing, due to the recurring pharyngeal infection, and the presence of pain in the right neck. Dr. Fields noted, "I have explained to Mr. Keller that I think it would be unlikely that he would develop a nasopharyngeal recurrence at this time and I hope that the nasopharyngeal prominence seen on CT scan is due to infection under his scarring." Dr. Fields did not testify at trial or by deposition; thus, these notations at the end of 1995 are the only evidence in the record regarding the prognosis of Keller's cancer.

C. Keller's Employment History

(November 3, 1993 through January, 1996)
Keller had been working as a road deputy for the Iberville Parish Sheriff's Office for approximately eight years at the time of this incident. The record reflects that he was physically fit and active, lifted weights and participated in sports regularly, and was very competent in his duties as a deputy, particularly those aspects which required physical strength and endurance such as chasing suspects on foot and physically restraining and subduing suspects during arrest operations. Immediately following the injury, Keller ceased working as a deputy, and sought treatment from Drs. Marshall and Clifford, as well as attempted pain relief via physical therapy. In January, 1994, Dr. Clifford opined that he had reached maximum medical improvement, and released him to return to work as of January 31. (see footnote 3, *1294 supra) Keller returned to work. He testified he was unable to participate in regular patrols, the LEAD Task Force and the SWAT team to the extent that he did prior to the back injury, due to the pain and the limitations of movement occasioned by the injury. He detailed an incident of a domestic violence call wherein he was physically unable to assist his partner in subduing a subject, and had to let his partner handle it alone. Furthermore, he encountered difficulty in the more basic duties as a deputy, in that he worked twelve hour shifts, but could not remain seated in a vehicle for more than twenty to thirty minutes without experiencing excruciating pain and numbness in his leg. He was also unable to wear his gun belt without his leg going numb. Keller testified that he "loved" being a sheriff's deputy, and that he would have never quit but for the back injury. However, after approximately one month back on the job, Keller felt it was "physically impossible" for him to continue in that type of work, and he requested a transfer to a less physically demanding position such as a "detective or something," but was told there were no such openings. Therefore, in a note dated February 3, 1994, typed by Keller's wife and signed by him. Keller gave his employer a two week notice of his resignation. When questioned about this resignation notice, which states he was resigning for "financial reasons," Keller explained, "I didn't think it was worth my while to go out there for that type of money and take chances like I was of doing further injury into [sic] my back, and I just couldn't see riding around in that kind of pain for that type of money." In corroboration of this testimony, John C. Blanchard, Captain for the Iberville Parish Sheriff's Office and supervisor over uniform deputies, testified that Keller talked with him about resigning from his employment prior to submitting the written notice. According to Captain Blanchard, Keller told him he was quitting "because of his back giving him problems, he was having trouble wearing his gun belts ... [g]etting in and out of the car, and he felt that he couldn't react as quick as he used to be able to and scared that he would cause himself to maybe get hurt a little further or another deputy get hurt."
Following his resignation from the Sheriff's Department, Keller went to work in his family's crawfish business, of which he is one-third owner, which had been in operation for approximately one year. Keller testified that he had worked in the crawfish business since its inception, taking on night shifts as a deputy so that he could work during the day as a crawfish farmer. According to Keller, as a result of the back injury, his work as a crawfish farmer was limited to driving a truck along the levee so that the sacks of crawfish in the boat could be periodically unloaded. He specifically denied doing any heavy lifting, stooping or bending. Although at the time of trial, Keller was still one-third owner of the business, he testified that his last day of work as a crawfish farmer was September 12, 1994, following his cancer diagnosis, prior to chemotherapy and radiation, and that he has not returned to work since that time.

ANALYSIS
A tortfeasor is only liable for damages caused by his negligent act; he is not liable for damages caused by separate independent or intervening causes of damage. Further, the plaintiff has the burden of proving that his injuries were not the result of separate, independent, and intervening causes. Rebstock v. Cheramie, 95-1388 p. 5-6 (La.App. 1st Cir. 2/23/96); 673 So.2d 618, 621. Stated another way, the plaintiff has the burden of proving, by a preponderance of the evidence, the causal connection between the accident and the damages claimed. Whether this burden has been sustained is a question of fact, which will not be disturbed on appeal unless clearly wrong. Guidroz v. State, Through the Department of Transportation and Development, 94-0253, p. 15 (La. App. 1st Cir. 12/22/94); 648 So.2d 1361, 1370.
In support of their argument that the back injury was not the cause of Keller's disability, defendants rely on the following evidence contained in the record: Dr. Clifford's release of Keller to work as of January 31, 1994; Keller's resignation letter from the Iberville Sheriff's Department, which indicates his resignation is due to "financial reasons"; a 1994 disability insurance *1295 Proof of Loss form, which indicates that prior to his diagnosis with cancer, Keller was working 40 hours per week as a crawfish farmer, and that he worked until September 12, 1994; Keller's testimony that he did, in fact, go to work in his family's crawfish business after his resignation from the Sheriff's Department and until his cancer diagnosis; a Mary Bird Perkins Social Services Assessment dated January 3, 1995, which indicates Keller's occupation as "crawfish farmer" and states that he has been unable to work since his cancer diagnosis; a crossbow permit application dated September 12, 1995, completed by Dr. Fields indicating Keller is permanently disabled due to "complications of cancer;" and testimony by Keller that he went hunting very soon following the back injury and that he had ridden a four-wheeler. The trial court found that the foregoing evidence was amply rebutted by other evidence in the record. Particularly, in his deposition, Dr. Clifford recanted his prior opinion that Keller could return to work because it was based on misinformation that Keller was a mechanic. Given Keller's occupation as a deputy, Dr. Clifford stated that he would not have released Keller to that type of work, and by the time of trial, Dr. Clifford was of the opinion that Keller's back injury prevented him from performing the physical activities required of law enforcement work. Furthermore, Dr. Clifford found a 10% disability and that Keller would continue to suffer from persistent periodic pain. Additionally, the trial court expressly found the plaintiff to be very credible, thus, Keller's testimony regarding the true reasons for resigning as a deputy (which were corroborated by Captain Blanchard's testimony), as well as Keller's explanation regarding his "employment" as a crawfish farmer and his testimony that all of his activities following the back injury, including hunting,[4] have been greatly curtailed and involve a great amount of pain, provide a sufficient basis for the trial court's conclusions, despite the evidence relied on by the defendants.
It is undisputed that Keller's cancer, the therapy therefor, and the complications resulting therefrom have negatively impacted Keller's health and employability since September, 1994. Certainly, at least temporarily, and to some degree, the cancer was, and possibly is, disabling to Keller. It is a virtual impossibility to evaluate how much of Keller's present-day disability is due to the back injury and how much is attributable to the cancer; the two conditions co-exist and are functionally inseparable. However, the question before the trial court was whether the evidence established a disabling back injury which resulted from the November 3, 1993 incident. Our review of the record reveals sufficient evidence from which the trial court reasonably could conclude that the back injury sustained by Keller on November 3, 1993, was disabling through the date of trial and is not expected to diminish.
Finally, the record contains evidence of vocational rehabilitation experts regarding the nature of Keller's disability and his future employability in light thereof. Plaintiffs' expert, Bobby S. Roberts, based on a series of physical and academic tests given to Keller, concluded that due to the physical limitations of his back injury and his mental aptitude test scores, Keller is basically unemployable. The defendants' expert, Mark Cheairs, found that despite Keller's back injury, he would be suitable to work at light sedentary jobs, citing as examples, process server and counter clerk. The trial court found these conclusions unreasonable in light of Dr. Clifford's testimony regarding the persistent pain suffered by Keller as a result of driving or sitting for extended periods of *1296 time. Further, the trial court found Cheairs' conclusions were based on mistaken facts relating to Keller's occupation and his medical condition. Essentially, the trial court made a credibility determination based on the experts' testimony in light of the medical evidence in the record, and accepted the conclusions of Mr. Roberts that Keller's back injury and the pain resulting therefrom rendered him permanently disabled. Thus, defendants are liable to Keller for all wages, past and future, lost as a result of that disability.

PAST LOST WAGES
The trial court awarded plaintiffs $25,000.00[5] for past wages to compensate Keller for from February, 1994, when he quit work, until the date of trial. Defendants argue that no lost wages are due; however, in the alternative, they urge that Keller is only entitled to those wages lost from February, 1994, until Keller's cancer diagnosis and disability in August, 1994. We have already found sufficient basis for the trial court's findings that the back injury rendered Keller disabled, and that the cancer, although disabling in and of itself, did not override the disabling nature of the back injury. Further, as noted by the trial court, there is no evidence in the record that Keller earned any income from the crawfish business. Accordingly, the past lost wages award, supported by the record, is affirmed.

FUTURE LOST WAGES
Both plaintiffs' and defendants' economic experts used similar figures for Keller's future work life and calculated total wage losses for permanent total disability within approximately the same range: $245,392.00 by Dr. Rice, economist for plaintiffs; $210,090.97 to $296,641.94 by Dr. Kenneth Boudreaux, economist for defendants. The trial court awarded $210,000.00, the lowest estimate for the present value of the future lost income. Again, defendants assign error to the award based on their contention that the back injury was not disabling. Having found support in the record for the conclusion that the back injury was indeed, disabling, both prior to and subsequent to the cancer, this argument has no merit. Defendants further contend that plaintiffs failed to prove that Keller's cancer would not diminish his earning capacity and the trial court erred in awarding a sum based on a normal life expectancy, particularly in light of Keller's cancer. Events after an accident that affect a plaintiff's life span can and should be taken into account in determining future damages. Degruise v. Houma Courier Newspaper Corporation, 95-1863, 95-2675 p. 6 (La. 11/25/96); 683 So.2d 689, 693. Defendants rely on the Degruise opinion for their contention that their liability should be diminished based on the reduced life expectancy due to Keller's cancer, in the absence of proof by the plaintiff that there is no reduced life expectancy. However, in Degruise, there was unanimous medical evidence presented that the plaintiff's life expectancy was, more probably than not, reduced to no more than five years as a result of cancer. In this matter, to the contrary, Dr. Fields' medical records establish that, more probably than not, Keller's cancer was in remission at the time of trial, is unlikely to recur; and thus, Keller's life expectancy is normal. In the absence of evidence to the contrary, the trial court did not err in awarding future lost wages for Keller's normal life expectancy. Accordingly, that award is affirmed.

Mrs. Keller's Loss of Consortium
In answer to the appeal, plaintiffs assign error to the trial court's award of $5,000.00 to Mrs. Keller for her loss of consortium, arguing that it is so low as to be an abuse of discretion, and that it should be raised to $10,000.00.[6] Although the record reflects that Mrs. Keller has suffered the loss of love and affection, companionship, impairment of sexual relations and loss of felicity *1297 due to her husband's disabling back injury and the pain caused thereby, a trial court is vested with great discretion in awarding damages. Our review of the record and plaintiffs' answer to this appeal fail to convince us that the award of $5,000.00 is so low to constitute an abuse of discretion. Accordingly, it is affirmed.
For the foregoing reasons, the judgment of the trial court is affirmed. Defendants are assessed all costs of this appeal.
AFFIRMED.
FITZSIMMONS, J., concurs and assigns reasons.
FITZSIMMONS, Judge, concurring with reasons.
I agree with the result reached by the majority, but I do not agree that the record contains support for the trial court's finding that the city failed to adequately train the police officer. The city police officer completed the basic training course offered by the Louisiana State Police and had on the job training. The actions of the officer were contrary to his training. The plaintiffs did not prove that further training was required or needed. Therefore, I respectfully concur.
NOTES
[*] Honorable Ralph Tyson serving by special appointment of the Louisiana Supreme Court.
[1] Officer Bonnette, as well as Deputies Keller and Vaughn, were all trained at the BASIC Academy at the L.S.U. Law Enforcement Training Program; Melissa Wright was the person who taught Bonnette when he attended the academy.
[2] At trial, defendants argued that Deputy Keller was negligent in taking evasive action which was unreasonable under the circumstances. The trial court found Keller's reaction was reasonable; defendants have not assigned error, nor does our review of the record reveal any manifest error in that factual finding.
[3] In a trial deposition taken on January 8, 1996, Dr. Clifford testified that his release of Keller to return to work in January of 1994 was based on erroneous information that Keller was employed as a mechanic. He testified that had he known that Keller was employed as a sheriff's deputy, given the rigorous physical demands of that line of work, he would not have released him to work at that time.
[4] Prior to the accident, Keller was an avid hunter; he testified that he "lived for hunting season to come up" and the record reflects that he would go to great lengths to make sure his schedule allowed him to hunt during hunting season. While Keller admitted that he continues to hunt, he testified that his hunting activities have been greatly curtailed due to the back injury in that he had to hunt from the ground because he was unable to use a climbing stand; he was unable to retrieve and clean the hunted game as he had done before, and he was unable to use a compound bow, and had to get a crossbow permit. According to Keller, these curtailments greatly diminishes his enjoyment of the sport, and he is unable to hunt at all without suffering worsened back pain as a result of the effort. Finally, because of the increased pain, he no longer hunts as much, or for as long as he used to.
[5] This amount was taken from the calculations of the economist experts: Dr. Boudreaux, for the defendants calculated past lost wages of $25,878.63; plaintiffs' expert calculated past lost wages of $24,970.00.
[6] Plaintiffs also raise as error the trial court's ruling that the "Professional Rescuer's Rule" is still a viable affirmative defense in Louisiana. In light of the other findings reached herein, we find it unnecessary to address this issue.