720 So.2d 789 (1998)
Jeff COURVILLE, Individually and on Behalf of the minor children, Jesse Dewayne VINCENT and Jacob Beau Courville, Plaintiff-Appellant,
v.
The CITY OF LAKE CHARLES, et al., Defendants-Appellees.
No. 98-73.
Court of Appeal of Louisiana, Third Circuit.
October 28, 1998.
*791 George Michael Canaday, Lake Charles, Jill Craft, Baton Rouge, for Jeff Courville.
John Foster DeRosier, James Buckner Doyle, Lake Charles, Winfred Thomas Barrett, III, Shreveport, Michael Glenn Hodgkins, Lake Charles, for City of Lake Charles, et al.
Susan A. Daigle, James T. Rivera, Lafayette, for Certain Underwriters at Lloyd's of London, et al.
Before WOODARD, PETERS and GREMILLION, JJ.
PETERS, Judge.
This survival and wrongful death suit arises out of a one-vehicle accident in which the driver, Tami Rene Courville, was killed when the vehicle went out of control and hit a telephone pole. At the time of the accident, she was being pursued by police officers with the Lake Charles Police Department. Mrs. Courville's husband, Jeff Courville, filed suit individually and on behalf of Jesse Dewayne Vincent,[1] Mrs. Courville's *792 minor son, and Jacob Beau Courville, Mr. and Mrs. Courville's minor son. He named as defendants the City of Lake Charles (the City) and its liability insurers, Lloyd's of London, St. Paul Reinsurance Company Limited, and CNA International Insurance Company Limited; Bellsouth Telecommunications, Inc., the owner of the telephone pole; the Lake Charles Police Department (LCPD); and LCPD Officers Frank S. Adams III, Curt Frank Cahoon, Susan Connor, Karl Jack Gillard, and William Joseph Nichols. Mr. Courville settled with Bellsouth Telecommunications, Inc., prior to trial. At trial, Mr. Courville's claims against the remaining defendants were dismissed on a motion for directed verdict. Mr. Courville has appealed, and the City; the LCPD; and Officers Adams, Cahoon, Connor, Gillard, and Nichols (defendants) have answered the appeal.[2]

DISCUSSION OF THE RECORD
Tami Courville was a recovering cocaine addict at the time she married Jeff Courville in March of 1989. However, in December of 1991, Mrs. Courville relapsed and again began using cocaine. Although she became involved with various treatment programs and she and her husband worked together to overcome her addiction, her efforts were unsuccessful.
On the evening of October 26, 1992, after returning home from an Alcoholics/Narcotics Anonymous meeting, Mrs. Courville took Mr. Courville's car keys and wallet as he showered. Before her husband could stop her, Mrs. Courville left in the family car, a blue Dodge Colt. At approximately 9:00 p.m., Mr. Courville called the LCPD and spoke with Sergeant Karl Jack Gillard. He informed Sergeant Gillard of his wife's cocaine problem, that she had stolen his automobile and was seeking a source of drugs, and of certain areas of town where the officers could possibly find her. According to Mr. Courville, he informed Sergeant Gillard that his wife was a danger to herself and others, although Sergeant Gillard did not recall those exact words.
Sergeant Gillard testified that Mr. Courville told him that the vehicle had been purchased during the marriage and that he told Mr. Courville that the car was just as much Mrs. Courville's as it was his. He also testified that he told Mr. Courville that the LCPD would release a notice to all units to be on the lookout for his wife (BOLO Notice).
At midnight, Sergeant Gillard observed the Courville vehicle on U.S. Interstate 10 in north Lake Charles. He called in the registration and found out that the vehicle belonged to Mr. Courville. Despite the fact that Sergeant Gillard observed no violations, he activated his bank lights and pulled Mrs. Courville over. Sergeant Gillard testified that the only reason for stopping Mrs. Courville was his "welfare concern" for her based on her husband's assertions to him three hours earlier. Shortly thereafter, Officer Curt Frank Cahoon and Officer Jerry Christopher Burke arrived in separate vehicles.
Sergeant Gillard testified that after the stop, he talked with Mrs. Courville briefly and tried to watch her actions. He explained to Mrs. Courville that her husband had called the police department, expressed concern about her drug use, and informed him that Mrs. Courville was going to the north end of town to obtain drugs. Sergeant Gillard testified that Mrs. Courville appeared "[f]airly calm" and "very normal" in reacting to this information and that she more or less acted like that was just something her husband would say. Sergeant Gillard observed nothing to cause him to believe that Mrs. Courville was under the influence of drugs or alcohol.
Officer Cahoon testified that Mrs. Courville did not seem surprised when told of her husband's assertions and told him that it was not the first time her husband had made such accusations. He found her to be cooperative and testified that her reaction to the assertions was "[v]ery indifferent."
*793 Officer Burke testified that Mrs. Courville appeared absolutely calm and "appeared to be just like any normal everyday person." He also testified that Mrs. Courville did not exhibit any of the symptoms he had seen of crack cocaine abuse. However, he did acknowledge that a person on crack cocaine could appear absolutely calm.
Officer Cahoon administered a nystagmus test, which is designed to check only for alcohol. No test was administered at that time to detect the presence of cocaine in Mrs. Courville's system. According to Officer Burke, testing Mrs. Courville for narcotics would have required taking her to a medical facility to have blood drawn or a urine sample taken. Mrs. Courville gave the officers permission to search her vehicle, but the officers did not find any contraband in the search.
Sergeant Gillard contacted Mr. Courville through a dispatcher to inform him that he had located and stopped his wife. Communicating through the dispatcher, Mr. Courville asked that the officers detain his wife at the scene. Sergeant Gillard responded to this request by informing Mr. Courville that he had no lawful reason to detain her. Mr. Courville then asked that the car be detained, but Sergeant Gillard explained that he could not force Mrs. Courville to leave the car. Sergeant Gillard advised Mrs. Courville to go home, and she responded that she was on her way.
Mrs. Courville next came into contact with the LCPD less than three hours later when, as a matter of routine patrol, Sergeant Frank S. Adams III drove by the Coastal Store, a convenience store located on 7th and Hodges Streets. Initially, Sergeant Adams did not see the store clerk, so he hesitated for a minute. He next observed a woman, later determined to be Mrs. Courville, exit the store in a rather quick and suspicious manner, with her head "panning" from side to side. According to Sergeant Adams, both of Mrs. Courville's hands were on her right side and were concealed from his view. As Mrs. Courville began walking toward the corner of the store, Sergeant Adams pulled into the store's parking lot with his car approximately fifty feet away from Mrs. Courville. Not being sure of exactly what was going on, Sergeant Adams yelled, "Hold on!" At that point, Mrs. Courville stopped moving and became "very fixated" on his position. According to Sergeant Adams, Mrs. Courville had a "determined and desperate" look on her face. He moved his vehicle about another ten or twelve feet closer to her, and Mrs. Courville continued to stare at him for another thirty to forty seconds. Sergeant Adams noticed that Mrs. Courville's hair was unkempt and her clothing was disarranged.
At this point, the store clerk peered out from the side entrance of the store and began motioning to Sergeant Adams to approach her. By then, Sergeant Adams was approximately twelve to fifteen feet from the clerk, who was the same distance from Mrs. Courville. Sergeant Adams was positioned between the two of them. According to Sergeant Adams, he asked the clerk what had happened, and the clerk said, "She robbed me!" When asked whether this was an armed robbery or whether Mrs. Courville had just stolen something, the clerk said something to the effect that "[s]he robbed all my money." Mrs. Courville then began walking around the corner of the store, and Sergeant Adams, now aware that a crime had occurred, began backing his vehicle around. Sergeant Adams continued to observe Mrs. Courville as she walked toward a dumpster with her hands still concealed, all the time turning around and looking at him. She eventually disappeared behind the dumpster.
At some point, Sergeant Adams was half in and half out of his vehicle, using his door and engine block as cover. Sometime before Mrs. Courville walked behind the dumpster, Sergeant Adams pulled his gun and ordered her to stop. She ignored the order and continued to walk toward the dumpster. After Mrs. Courville disappeared behind the dumpster, Sergeant Adams heard a door slam and saw the taillights of a car as Mrs. Courville began backing up. Sergeant Adams then moved his vehicle forward toward the dumpster and toward Mrs. Courville's vehicle to block her backward movement. During this time, the officer continued to issue orders for her to stop and kill the vehicle's engine. Being blocked by *794 Sergeant Adams from the rear, Mrs. Courville pulled forward, made a U-turn, and drove onto Hodges Street.
As Sergeant Adams followed Mrs. Courville's vehicle onto Hodges Street, he began transmitting over his police radio that he was in pursuit of a robbery or armed-robbery suspect. Sergeant Adams pursued Mrs. Courville southbound on Hodges Street, reaching speeds of between fifty-five and sixty miles per hour. Officer William Joseph Nichols responded to Sergeant Adams's transmission by driving east on 18th Street toward its intersection with Hodges Street, a point south of the location of Mrs. Courville and Sergeant Adams. As Mrs. Courville approached the intersection of 17th and Hodges Streets, she apparently observed Officer Nichols at the 18th Street intersection because she responded by applying her brakes, locking her wheels, and skidding. She then cut across a yard on the southeast corner of 17th and Hodges Streets, drove over a railroad tie, and proceeded east on 17th Street. Officer Nichols then joined in the pursuit on 17th Street. It also appears that an Officer Cooper joined in the pursuit at that time as well. All three officers had turned on their blue bank lights.
Mrs. Courville continued to the intersection of 17th and Common Streets and executed a wide turn northbound onto Common Street, which runs parallel to Hodges Street. Officer Cahoon began approaching Common Street headed eastbound on 12th Street. When he reached the intersection of 12th and Common Streets, he fell in behind Mrs. Courville and in front of Sergeant Adams. Around this time, Sergeant Adams gave the command for the police units to back off in order not to crowd Mrs. Courville. The units did withdraw to some degree, but continued the pursuit. The chase continued with the units traveling about fifty to fifty-five miles per hour.
Just north of 6th and Common Streets, the road curved slightly. According to Sergeant Adams, Mrs. Courville negotiated that curve "quite well" and "with apparent ease." Officer Nichols testified that he lost sight of Mrs. Courville as she reached that point. Officer Cahoon, who was driving the lead unit, testified that he lost sight of Mrs. Courville when she went through the intersection of Common and Clarence Streets, north of the curve.
In the meantime, in response to the radio transmission, Officer Susan Connor proceeded north of the pursuit to the intersection of Kirby and Common Streets. In doing so, she intended to position herself to observe which way Mrs. Courville might go and to assist. Officer Connor turned onto Common Street in the southbound lane and remained stationary. She had her headlights on but had not turned on her blue bank lights. Immediately, Officer Connor saw Mrs. Courville approaching the intersection of Clarence and Common Streets in the northbound lane. At that point, Officer Connor saw reflections of blue lights behind Mrs. Courville but could not see the police units. Officer Connor observed Mrs. Courville zigzag across the road at a very fast speed after Mrs. Courville cleared that intersection. Mrs. Courville struck a telephone pole at the eastbound intersection of Iris and Common Streets, approximately 700 feet north of Officer Connor's position. She was ejected from the vehicle and sustained multiple severe injuries, including the amputation of her left leg at the hip. Mrs. Courville died as a result of the collision. The death certificate lists the time of death as 2:55 a.m. The subsequent drug analysis revealed the presence of cocaine in Mrs. Courville's system. No weapon was recovered.
Mr. Courville filed suit, seeking survival and wrongful death damages as well as punitive damages and reasonable attorney fees under 42 U.S.C. § 1983. The defendants sought recovery of all costs, including attorney fees, in defense of the lawsuit pursuant to La.R.S. 42:261(E). Additionally, the defendants asserted the defense of immunity under La.R.S. 9:2798.1. The defendants also filed an Amending and Supplemental Answer and Exception of No Cause of Action, pleading qualified immunity to the § 1983 claim. A bench trial was held, and the trial court granted a motion for directed verdict filed by the defendants. Mr. Courville has appealed that judgment, and the defendants have answered the appeal.

*795 STANDARD FOR DISMISSAL
After Mr. Courville presented his case, the defendants moved for a directed verdict, which the trial court granted. On appeal, Mr. Courville contends that the trial court erred in applying the standard for a directed verdict rather than for an involuntary dismissal because the evidence was presented in a bench trial.
The motion for directed verdict presupposes that the issue on which the motion is sought will be presented to a jury. Citgo Petroleum Corp. v. Yeargin, Inc., 95-1574 (La.App. 3 Cir. 2/19/97); 690 So.2d 154, writs denied, 97-1223, 97-1245 (La.9/19/97); 701 So.2d 169, 170. The motion for directed verdict may be granted by the trial court if, after weighing all evidentiary inferences in a light most favorable to the nonmovant, it is clear that the facts and inferences are overwhelmingly in favor of the mover such that reasonable men could not reach a contrary verdict. Id. However, the proper procedural vehicle for dismissal in an action tried by the trial court without a jury is an involuntary dismissal "on the ground that upon the facts and law, the plaintiff has shown no right to relief." La.Code Civ.P. art. 1672(B). The trial court may then determine the facts and render judgment in favor of the mover and against the plaintiff. Id. In granting the motion for involuntary dismissal, the trial court must evaluate all of the evidence without any special evidentiary inferences in favor of the mover's opponent and determine that the nonmover has failed to establish proof by a preponderance of the evidence. Citgo Petroleum Corp., 690 So.2d 154. The granting of the motion for involuntary dismissal is not reversible absent manifest error. Id.
The trial court expressly evaluated the evidence under the directed verdict standard when it should have evaluated the evidence under the involuntary dismissal standard. Therefore, Mr. Courville asserts that in light of this legal error by the trial court, we must review the case de novo. However, a legal error occurs when a trial court applies an incorrect principle of law and the error is prejudicial. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98); 708 So.2d 731. A legal error is prejudicial when it materially affects the outcome and deprives a party of substantial rights. Id. It is where one or more trial court legal errors interdict the fact-finding process that the manifest error standard is no longer applicable and a de novo review of the record is warranted. Id.
In the instant case, the error is clearly harmless because the standard for directed verdict is actually much higher in the plaintiff's favor than the standard for involuntary dismissal. Therefore, we will treat the judgment as an involuntary dismissal and review it under the manifest error standard.

STATE TORT ACTION
Mr. Courville contends that the trial court erred in failing to find that Officers Adams, Cahoon, Connor, Gillard, and Nichols were negligent and that the City was vicariously liable and independently negligent for its own actions or inactions. Essentially, Mr. Courville's negligence claim involves the failure of Sergeant Gillard and Officer Cahoon to detain Mrs. Courville at the BOLO stop on Interstate 10; Sergeant Adams's failure to prevent Mrs. Courville from leaving in the vehicle from the parking lot of the Coastal Store; the officers' pursuit of Mrs. Courville; and the LCPD's failure to train its officers and effectively establish pursuit procedures.
A duty-risk analysis is used to determine whether liability exists under the facts of a particular case. Stroik v. Ponseti, 96-2897 (La.9/9/97); 699 So.2d 1072. Under a duty-risk analysis, a plaintiff must prove that (1) the conduct in question was the cause-in-fact of the harm, (2) the defendant owed a duty of care to the plaintiff, (3) the defendant breached the requisite duty, and (4) the risk of harm was within the scope of protection afforded by the duty. Id. In order for a plaintiff to recover under a negligence theory, all four inquiries must be answered affirmatively. Id.

The BOLO Stop on Interstate 10
It is Mr. Courville's position that Sergeant Gillard and Officer Cahoon were *796 negligent in failing to detain Mrs. Courville at the BOLO stop on Interstate 10. As we appreciate the testimony, William Kenneth Katsaris, Mr. Courville's expert in the field of police practices, policies, and procedures, was of the opinion that Officers Gillard and Cahoon were negligent in failing to call Mr. Courville to allow him to come to the scene as soon as they stopped Mrs. Courville or shortly thereafter so that Mr. Courville could have intervened.
Mr. Courville contends that the officers knew or should have known at the time of the stop of the impaired condition of Mrs. Courville. In support, Mr. Courville points to the testimony of Sunny Brown Farley, a reporter for the Southwest Daily News, who lived near the location of the wreck. She heard the crash and was outside during part of the aftermath of the wreck. According to Mrs. Farley, an LCPD officer made comments to the effect that "we pulled her over earlier in the evening and she looked like she was as high as a kite then" and "this is your brain on drugs." However, Mrs. Farley could not identify the officer who made the comments. Moreover, Officer Burke was not at the scene of the wreck, and both Sergeant Gillard and Officer Cahoon denied making those comments.[3]
Additionally, Mr. Courville points to testimony by Officer Burke that a person on crack cocaine could appear absolutely calm.[4] However, while Officer Burke testified that Mrs. Courville appeared absolutely calm, he also testified that Mrs. Courville did not show any of the symptoms he had seen of crack cocaine abuse. Officer Burke, who is no longer with the LCPD and who is not a defendant in this lawsuit, testified that Mrs. Courville "appeared to be just like any normal everyday person." Additionally, Officer Burke testified that in order to test to see if Mrs. Courville had any type of narcotics in her system, she would have had to have been taken to a medical facility to have blood drawn or a urine sample taken and that at that time, they had no probable cause to believe she had taken any narcotics. Sergeant Gillard testified that there was nothing that led him to believe Mrs. Courville was under the influence of drugs or alcohol. Furthermore, Sergeant Gillard testified that his reason for stopping Mrs. Courville was based only on "welfare concern" and that she had committed no violations. Additionally, the officers searched the vehicle but did not find any contraband.
If the testimony of Sergeant Gillard and Officers Cahoon and Burke is accepted as credible, they were faced with the lack of any indication of intoxication or impairment (other than calmness), the lack of any traffic violations, and the lack of any evidence of contraband. Therefore, they had no valid reason to detain Mrs. Courville any longer. It appears that the trial court accepted this testimony as credible, and we find no manifest error in this regard. However, even if, as suggested in the testimony of Mrs. Farley, the officers had determined that Mrs. Courville was driving while under the influence of cocaine such that they could have arrested her, interestingly, that is not the issue because Mr. Courville is not even claiming that the officers should have made an arrest at the BOLO stop. In fact, even Mr. Katsaris did not suggest that an arrest was warranted at that point.
We note that La.R.S. 28:53(L)(1) provides that a peace officer may take a person into protective custody and transport him to a treatment facility for a medical evaluation when, "as a result of his personal observation," the peace officer has reasonable grounds to believe the person is acting in a manner dangerous to himself or dangerous to others, is gravely disabled, and is in need of immediate hospitalization to protect such a person or others from physical harm. However, under the language of the statute, awareness of cocaine intoxication, without *797 more, is not a ground for taking a person into protective custody. Importantly, none of the officers at the scene testified to any observations of Mrs. Courville acting in a manner dangerous to herself or others or being gravely disabled or being in need of immediate hospitalization. In fact, Sergeant Gillard testified that Mrs. Courville appeared "[f]airly calm" and "very normal." Officer Burke testified that Mrs. Courville appeared absolutely calm and "appeared to be just like any normal everyday person." Mr. Katsaris was of the opinion that the officers could have used La.R.S. 28:53(L)(1) to detain Mrs. Courville for further investigation and long enough for Mr. Courville to have arrived at the scene, but even he admitted that he did not see anything, according to the testimony, that indicated that the officers could have taken Mrs. Courville in under that statute. Additionally, we find no authority in the statute that would have allowed the officers to detain Mrs. Courville at the scene to allow her husband to intervene.
Mr. Courville simply has not pointed us to any authority that required the officers to detain his wife at the scene so that he could have come to the scene and intervened in the situation, and we have found no such authority. Thus, the claim arising out of the BOLO stop fails on the duty issue, and, therefore, we find no error in the trial court's rejection of the claim in that regard.

The Confrontation at the Coastal Store and the Pursuit
It is Mr. Courville's position that Officer Adams was negligent in allowing Mrs. Courville to get behind the wheel of a car and onto the road. Additionally, it is Mr. Courville's position that officers with the LCPD were negligent in violating their own policy by having too many police units involved in the pursuit, in failing to terminate the pursuit when it was readily apparent that Mrs. Courville was unable to maintain control of the vehicle, and in exceeding the speed limit allowed by their policy. Mr. Courville also contends that the City was vicariously liable for the negligence of its officers and independently negligent for failing to adequately train its officers and effectively establish pursuit procedures.
Police officers have the duty of maintaining peace and order, preventing and detecting crime, and enforcing laws. Zeagler v. Town of Jena, 556 So.2d 978 (La.App. 3 Cir.), writ denied, 560 So.2d 14 (La.1990). The duty is owed to the public in general but may be transformed into a duty to an individual where a personal or individual relationship arises between the officer and an individual through closeness in proximity or time. Id. Generally, a police officer, in carrying out his authority to enforce laws, has the duty to act reasonably to protect life and limb, to refrain from causing injury or harm, and to exercise respect and concern for the well-being of those whom he is employed to protect. Keller v. City of Plaquemine, 96-1933 (La.App. 1 Cir. 9/23/97); 700 So.2d 1285, writ denied, 97-2635 (La.1/16/98); 706 So.2d 977. The supreme court has addressed the duty owed by an officer when approaching a subject prior to disarming him or effectuating an arrest. See Stroik, 699 So.2d 1072; Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94); 646 So.2d 318; Kyle v. City of New Orleans, 353 So.2d 969 (La.1977). In such cases, the duty is one of reasonableness under the totality of the circumstances. See id. We note that Stroik, Mathieu, and Kyle involved the issue of excessiveness of force, and we find the pursuit issue sufficiently analogous to allow application of the standard employed in those cases. In White v. City of Baker, 95-2009 (La.App. 1 Cir. 5/17/96); 676 So.2d 121, writ denied, 96-1547 (La.9/27/96); 679 So.2d 1351, the first circuit held that the same standard was applicable in a situation in which an officer was attempting to apprehend an individual who disobeyed a police order and was fleeing from the officer, which ended with the fleeing vehicle overturning and killing a guest passenger. However, the claim arising from the Coastal Store encounter is more properly characterized as the failure to use sufficient force to detain Mrs. Courville. In any event, the same standard of reasonableness should apply, albeit with the application of different factors. Thus, we will analyze the duty issue in terms of reasonableness under the totality of the circumstances. We note that the officer's *798 actions need not be the "best" method of approach; rather, the standard of care requires choosing only a course of action that is reasonable under the circumstances. See Mathieu, 646 So.2d 318.
Concerning the Coastal Store incident, Mr. Courville's expert, Mr. Katsaris, thought that Sergeant Adams should have called for backup. Mr. Katsaris did not believe, from Sergeant Adams's actions, that Sergeant Adams thought he was in jeopardy. Therefore, he was of the opinion that while Mrs. Courville's vehicle was against the curbing near the dumpster, Sergeant Adams should have blocked her in quickly by positioning his vehicle behind hers so that the passenger side of his vehicle was against the trunk of her vehicle. Mr. Katsaris was of the opinion that Sergeant Adams should have then exited his vehicle, maintained a position of cover behind his vehicle with his weapon drawn, and commanded her to get out of her vehicle. Mr. Katsaris also testified that even if Sergeant Adams thought Mrs. Courville had a gun, he could have used deadly force to stop her, including ramming or shooting if necessary.
When Sergeant Adams initially saw Mrs. Courville, he was suspicious and pulled into the store's parking lot. He yelled "Hold on!," and Mrs. Courville responded by becoming "very fixated" on his position. When the clerk informed him that Mrs. Courville had robbed her, Mrs. Courville began moving around the corner of the store, and Sergeant Adams followed her in his vehicle. During this time, Mrs. Courville's hands were concealed from Sergeant Adams. He pulled his gun on her and challenged her to stop, but she disappeared behind the dumpster. When she got into the car and began backing up, Sergeant Adams placed his vehicle behind hers to block her from moving backward. She then pulled forward, made a Uturn, and exited the parking lot.
It is clear that Sergeant Adams did attempt to detain Mrs. Courville through the use of commands, his drawn gun, and the positioning of his vehicle. However, he had competing considerations in calculating his actions. On the one hand, he was confronted with a woman who had not harmed the clerk, did not break and run when confronted, and did not react violently to him. On the other hand, he had reason to believe she had a weapon because he had been informed that she had robbed the clerk's money and because her hands were on her right side concealed from his view. Additionally, her disposition and reactions were unusual in that she had a "determined and desperate" look on her face, took the unusual posture of staring at Sergeant Adams when he confronted her, and in an unhurried way continued on her course when challenged by Sergeant Adams.
In sum, Sergeant Adams was dealing with a woman who had not shown that she intended to hurt anyone if left alone but who he could have assumed might have been in the frame of mind and with the power to do so if pushed. He was faced with the responsibility of apprehending a suspected felon as well as his concerns for the safety of the clerk, himself, and the suspected felon. Therefore, Sergeant Adams's failure to be more aggressive with Mrs. Courville was justified. Sergeant Adams testified that had he blocked the vehicle, he would have essentially trapped Mrs. Courville and that she could have run back into the store and harmed the clerk or taken the clerk hostage. Additionally, Sergeant Adams could have justifiably believed that Mrs. Courville had a gun and would have started shooting at him if she had felt trapped. We find it anomalous that Mr. Katsaris would suggest that the use of deadly force at the Coastal Store could have been appropriate in a case in which the issue is whether the police officers were responsible for causing the death of Mrs. Courville. While allowing Mrs. Courville to drive out of the parking lot was risky, given the time of day, shortly before 3:00 a.m., and the risks of trapping her at the Coastal Store, the record supports that the decision was not an unreasonable one. As set forth above, the officer's course of action need not have been the best method of approach but only a reasonable one under the circumstances. See id. Therefore, we find no manifest error in the trial court's determination that there was no negligence in regard to the Coastal Store encounter.
*799 We now address the pursuit. It is Mr. Courville's position that officers of the LCPD were negligent in violating their own policy by having too many police units involved in the pursuit, in failing to terminate the pursuit when it was readily apparent that Mrs. Courville was unable to maintain control of the vehicle, and in exceeding the speed limit allowed by their policy.
The LCPD Department Rules and Regulations, General Order 87-3 provides department policy for pursuit operations. We find that a violation of these policies is not negligence per se. Section II(B)(1) of General Order 87-3 provides in part: "No more than three (3) vehicles will be involved in a pursuit." At the time of the accident, there were four police vehicles involved in the pursuit: the unit driven by Sergeant Adams and the units driven by Officers Cahoon, Nichols, and Cooper. However, the record does not show that the involvement of more than three police units was a cause-in-fact of Mrs. Courville's wreck. All of the pursuing units were lined up behind Mrs. Courville, having joined in the pursuit at different locations. Officer Connor was not part of the pursuit but merely formed part of the perimeter to observe Mrs. Courville's direction. Officer Connor did not block Mrs. Courville's path and did not even activate her blue bank lights so that it is not clear that Mrs. Courville would have even known that Officer Connor represented additional police presence. When Mrs. Courville wrecked her vehicle, not one of the pursuing units was even in her sight. There is simply no indication in the record that but for the fact that there were four rather than three units Mrs. Courville would not have wrecked.
Section II(D)(7)(b) and (c) of General Order 87-3 provides:[5]
b. Officers shall make reasonable efforts to apprehend fleeing violators, but pursuit will not be carried to such an extent as to appreciably endanger the lives of innocent third parties or the officer.
c. The officer will terminate the pursuit when it is determined the safety of the public, road or vehicle conditions, weather, or severity of the offense does not justify continuing the pursuit.
In pursuing Mrs. Courville, the officers were attempting to apprehend a suspected armed robber to discharge their duty to enforce the laws. The nature of the offense justified continuing the pursuit. The pursuit occurred shortly before 3:00 a.m., a time in which civilian traffic would have been minimal at best. There is no indication that the weather conditions were hazardous or that the street was anything other than a normal city street or that other vehicles encroached upon Mrs. Courville's travel lane or prevented her from moving. In fact, Sergeant Adams testified that there was no time during the pursuit when Mrs. Courville was left without a way out. While Officer Connor was stationed in the southbound lane facing Mrs. Courville's vehicle, which was approaching in the northbound lane, she was in no way blocking Mrs. Courville, and Mrs. Courville had several outs at that point. At the time of the accident, none of the pursuing vehicles were close enough to witness the accident.
Additionally, Sergeant Adams testified that there were no overt signs of impairment in Mrs. Courville's driving. Mrs. Courville managed to successfully negotiate two turns, railroad tracks, and a curve. While Sergeant Adams testified that she went into a skid at the corner of Hodges and 17th Streets and that her back wheels came off the ground and that she went into the other lane of travel at the railroad tracks, he also testified that Mrs. Courville seemed in control of the vehicle at all times he observed the vehicle. Sergeant Adams testified that when Mrs. Courville was driving in a straight line, she maintained her lane. Officer Connor stated that after Mrs. Courville cleared the intersection of Clarence and Common Streets, her vehicle moved from one side of the road to the other "real fast" and that she was concerned *800 that Mrs. Courville was going to wreck. However, the pursuing officers were not able to see Mrs. Courville at this point, and the accident occurred shortly thereafter.
Thus, we find no violation of the police policy in this regard, and under the jurisprudential standard of reasonableness, we find no manifest error in the trial court's findings.
Finally, Officer Burke indicated that the pursuit policy required speeds not in excess of ten miles per hour above the speed limit. It appears that at some point along the pursuit route the speed limit was only thirty-five miles per hour, yet the police units reached speeds of up to sixty miles per hour. We have not found in General Order 87-3 that there was a ten-mile-per-hour-over-the-speed-limit restriction. Rather, Section II(C)(2) of General Order 87-3 provides in part:
Speed will be that which is reasonable giving careful consideration of such things as weather, traffic control devices, character of neighborhood, traffic volume, road/vehicle conditions, and nature of violation.
Additionally, the driver of an authorized emergency vehicle is not held to the more stringent duties applicable to ordinary drivers. White, 676 So.2d 121. Rather, the driver of an authorized emergency vehicle, when in the pursuit of an actual or suspected violator of the law, may exercise certain privileges, including proceeding past a red or stop signal or stop sign, exceeding the maximum speed limits, and disregarding regulations governing the direction of movement or turning in specified directions; however, the driver is not thereby relieved from the duty to drive with due regard for the safety of all persons. La.R.S. 32:24(A), (B)(2)-(4), and (D).
In Brown v. City of New Orleans, 464 So.2d 976 (La.App. 4 Cir.1985), police officers saw a vehicle run a stop sign. The officers signaled for the vehicle to stop, and it did. As one of the officers approached the vehicle to ticket the driver, the vehicle accelerated and drove away at a high rate of speed. The police then chased the vehicle at a speed of between forty and fifty miles per hour for seven or eight blocks. During the pursuit, the vehicle maintained a distance of two blocks ahead of the police car and reached speeds of between sixty and seventy miles per hour. The driver of the vehicle ran a stop sign and struck another vehicle, killing a passenger in the other vehicle. The fourth circuit held that merely driving over the speed limit in pursuit of a suspected felon was not negligence per se. The court found that there was no other evidence presented to indicate that the officers acted negligently in pursuing the vehicle. The court added: "[T]he plaintiff's implication that the police officers caused this accident is absurd. The only person responsible for this tragic accident is ... the driver of the [fleeing vehicle]." Id. at 977.
McElreath v. Progressive Insurance Co., 595 So.2d 693 (La.App. 5 Cir.), writ denied, 596 So.2d 557 (La.1992), involved a suit to recover damages following an intersectional collision in which the driver of a motorcycle fleeing from police rammed the side of an automobile. During the pursuit, the officers reached estimated speeds of not more than sixty to seventy miles per hour. The one-and-a-half-mile chase lasted less than one minute, and the officers were approximately one block behind the motorcycle at the time of the collision. The court held that the officers acted properly and reasonably in attempting to stop the continued operation of the motorcycle in a reckless and dangerous manner.
All factors considered in the instant case, we find no violation of the police policy or manifest error in the conclusion that the officers did not breach the standard of reasonableness regarding their speed.
Because we affirm the finding of no negligence on the part of the LCPD officers, the claim of vicarious liability against the City must fall. Additionally, since we affirm the finding of no negligence in the pursuit, the claim of independent negligence on the part of the City for failing to adequately train its officers and for failing to effectively establish pursuit policies must also fall.

IMMUNITY UNDER LA.R.S. 9:2798.1
Having found no liability for the state tort claims, we need not address the issue of the *801 defendants' entitlement to immunity under La.R.S. 9:2798.1.

42 U.S.C. § 1983 ACTION
Mr. Courville contends that the trial court erred in allowing the defendants to amend their answer less than one week prior to the beginning of trial to assert for the first time a defense of qualified immunity to his claim under 42 U.S.C. § 1983. Additionally, Mr. Courville contends that the trial court erred in affording Officers Adams, Cahoon, Connor, Gillard, and Nichols qualified immunity regarding his claim under 42 U.S.C. § 1983.
"As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, ____, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). It is only then that this court should address the issue of qualified immunity. See id.
As we appreciate his argument, Mr. Courville contends that the right violated in the instant case is the Fourth Amendment's protection against unlawful seizure in that the pursuit amounted to an unlawful seizure. In Lewis, which was decided after Mr. Courville filed his appellate brief in this court, the Supreme Court rejected a similar argument and found that the appropriate analysis was under the Fourteenth Amendment's right to substantive due process. Accordingly, we also reject Mr. Courville's argument on seizure and analyze this case under substantive due process.
In Lewis, the issue was whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspect. The Supreme Court answered "no" and held "that in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Id. at ___, 118 S.Ct. at 1711-12. Stated another way, the court held "that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." Id. at ___, 118 S.Ct. at 1720.
In Lewis, Sheriff's Deputy James Everett Smith, along with another officer, Murray Stapp, responded to a call to break up a fight. Upon returning to his patrol unit, Stapp saw a motorcycle approaching at a high rate of speed. Eighteen-year-old Brian Willard was operating the motorcycle, and sixteen-year-old Philip Lewis was a passenger on the motorcycle. Neither boy was involved in the fight that prompted the call to the police. Stapp turned on his overhead rotating lights, yelled to the boys to stop, and pulled his patrol unit closer to Smith's unit in an attempt to pen in the motorcycle. Instead of pulling over, Willard maneuvered the motorcycle between the two police cars and sped off. Smith immediately turned on his emergency lights and siren, made a quick turn, and began pursuing the boys. The motorcycle wove in and out of oncoming traffic for seventy-five seconds over a course of 1.3 miles in a residential neighborhood, forcing two cars and a bicycle to swerve off of the road. Both the motorcycle and patrol car reached speeds of up to 100 miles per hour, with Smith following at a distance as short as 100 feet, which meant that his car would have required 650 feet to stop. The chase ended after the motorcycle tipped over as Willard tried to make a sharp left turn. The patrol car skidded into Lewis, who was pronounced dead at the scene.
In addressing the § 1983 action brought by Lewis's parents, the Supreme Court emphasized that "`[t]he touchstone of due process is protection of the individual against arbitrary action of government....'" Id. at ___, 118 S.Ct. at 1716 (quoting Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974)). The Court reiterated that the test of executive abuse of power is whether the action shocks the conscience. See id. The Court held that regardless of whether Smith's behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it did not shock the conscience for purposes of accountability under a § 1983 action. The Court explained *802 that Smith was faced with a course of lawless behavior for which the police were not to blame in that the police had done nothing to cause Willard's high-speed driving, nothing to excuse his flouting of law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed. The Court noted that while prudence would have repressed the reaction, the officer's instinct was to do his job, not to induce Willard's lawlessness or to terrorize, cause harm, or kill. The Court added: "Prudence, that is, was subject to countervailing enforcement considerations, and while Smith exaggerated their demands, there is no reason to believe that they were tainted by an improper or malicious motive on his part." Id. at ___, 118 S.Ct. at 1721.
Likewise, in the instant case, the officers were faced with a course of lawless behavior for which they were not to blame in that they had done nothing to cause Mrs. Courville's high-speed driving, nothing to excuse her flouting of law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage her to drive carelessly. The officers' instincts in pursuing Mrs. Courville were to do their jobs, not to induce Mrs. Courville's lawlessness or to terrorize, cause harm, or kill. There simply is no evidence in the record to show, nor does Mr. Courville contend, that in pursuing Mrs. Courville, the officers had an intent to cause harm to her unrelated to the legitimate object of making an arrest. Therefore, the officers' actions in the pursuit do not amount to a violation of substantive due process which would give rise to liability under § 1983.
Because the officers' actions do not amount to a violation of substantive due process, the issues raised by Mr. Courville regarding qualified immunity are moot, and we will not address those issues.

DEFENDANTS' ANSWER TO THE APPEAL
The defendants have answered the appeal, seeking reversal of the trial court's denial of their motion to traverse Mr. Courville's pauper status and an award of attorney fees and costs in connection with the defense of the case at the trial and appellate levels in accordance with La.R.S. 42:261(E) as well as damages for frivolous appeal.
La.R.S. 42:261(E) provides in relevant part:
Any party who files suit against any duly elected or appointed public official of this state of or any of its agencies or political subdivisions for any matter arising out of the performance of the duties of his office... and who is unsuccessful in his demands, shall be liable to said public official for all attorneys fees incurred by said public official in the defense of said lawsuit or lawsuits, which attorneys fees shall be fixed by the court.
(Footnote omitted).
The defendants assert that the importance of the denial of their motion to traverse Mr. Courville's pauper status is that this statute does not apply if the party who instituted the claim is granted pauper status.
On October 22, 1993, the trial court signed an order granting pauper status to Mr. Courville. Prior to the end of the trial, on May 23, 1997, the defendants filed a Motion to Traverse Pauper Status based on Mr. Courville's trial testimony that he earns approximately $24,000.00 per year in his job. When the motion was argued at trial, Mr. Courville's attorney pointed out some of his financial obligations and suggested that he needed to be able to testify as to his expenses in determining the issue. The trial court denied the defendants' motion at that time in light of the fact that the parties were in the middle of trial, that the pauper status had previously been approved, that additional testimony was necessary for the court to render a decision on that issue, and that the pauper status did not require costs in advance. It is apparent that the trial court did not adjudicate the issue but merely declined to rule on it at that time. However, we have not found anywhere in the record where the defendants subsequently brought up the issue for the presentation of evidence and adjudication by the trial court.
In any event, we note that on July 8, 1997, after the trial had ended, the defendants filed a Motion to Fix Legal Fees, seeking costs in *803 the amount of $61,681.32 under La.R.S. 42:261(E). The trial court set a hearing on the matter for September 4, 1997. The disposition of this motion is not contained in the record, but Mr. Courville has submitted to us a Motion to Supplement the Record to which he has attached the defendants' Motion to Dismiss with Prejudice in which the defendants moved to dismiss with prejudice their Motion to Fix Legal Fees under La.R.S. 42:261(E). Mr. Courville has also attached to his motion the trial court's order dismissing the Motion to Fix Legal Fees with prejudice. We grant the Motion to Supplement the Record, and having done so, we find that the dismissal of the Motion to Fix Legal Fees under La.R.S. 42:261(E) renders moot our consideration of the defendants' claim under La.R.S. 42:261(E). Since the defendants sought on appeal to have the pauper status revoked in order to avail themselves of La.R.S. 42:261(E), the issue of pauper status is also moot.
The defendants also seek damages for frivolous appeal under La.Code Civ.P. art. 2164. Under La.Code Civ.P. art. 2164, an appellate court may award damages for frivolous appeal. However, damages for frivolous appeal will not be awarded unless it appears that the appeal was taken solely for the purpose of delay, that serious legal questions are not raised, or that the attorney does not seriously believe in the position he advocates. Robinson v. Thornton, 96-1329 (La. App. 3 Cir. 10/29/97); 705 So.2d 745, writ denied, 97-2963 (La.2/6/98); 709 So.2d 739. We do not find that the instant appeal was taken solely for the purpose of delay or that counsel does not seriously believe in the position advocated, and we find that serious legal issues have been raised. Therefore, we deny damages for frivolous appeal.

DISPOSITION
For the foregoing reasons, we affirm the judgment of the trial court. We assess costs of this appeal to Mr. Courville to the extent allowed by law.
AFFIRMED.
NOTES
[1] Mr. Courville's capacity to bring suit on behalf of Jesse Dewayne Vincent has not been challenged on appeal.
[2] Although the City's liability insurers are also defendants, they are represented by different counsel and have not appeared in this appeal. Therefore, for the purposes of the remainder of this opinion, any reference to "defendants" includes only the City; the LCPD; and Officers Adams, Cahoon, Connor, Gillard, and Nichols.
[3] Specifically, Officer Cahoon denied making the statement about Mrs. Courville being as high as a kite and did not recall making the comment that "this is your brain on drugs."
[4] Officer Burke's testimony concerning calmness being a symptom of crack cocaine was not supported by any other LCPD officers' testimony, although Mr. Katsaris testified that he would not disagree with Officer Burke's testimony in this regard because it depends on the stage of the intoxication and because different people can react differently.
[5] We note that Section II(D)(11)(b) provides: "If the situation becomes uncontrollable or unsafe, the controlling supervisor or primary element will terminate our assistance in the pursuit." However, this language is found under the heading entitled "Pursuit by other agencies in the City of Lake Charles."